NELSON HULL AND JOHN T. LIDDLE, Executors of the Estate of O. N. HULL, Deceased, v. CITY OF CEDAR RAPIDS, Appellant.

**Dedication to City:** EVIDENCE. Dedication of a strip in extension of a street, and acceptance thereof by the city, are shown by the owner selling lots on either side, representing the same as corner lots, and acquiescing in the use of the same as a public street for fourteen years thereafter, and by the construction of fences on either side, with gates opening into the street, the building of sidewalks and planting of trees along it, and the improvement of it by the city by digging side ditches along it and keeping them open, working the middle of the road and clearing away the snow in the winter.

TAXATION BY CITY: *Estoppel.* Exaction by a city of taxes on prop-
2   erty after its dedication as a street does not estop it from
claiming that it had become a public street.

*Appeal from Linn District Court.*—HON. W. N. TREICHLER,
Judge.

FRIDAY, MAY 18, 1900.

ACTION in equity to quiet title to a strip of land. The
defendant pleaded that it had been dedicated by the owner
as a public street, and accepted by the city as such. Decree
was entered as prayed, and defendant appeals.—*Reversed.*

*John N. Hughes* for appellant.

*Deacon & Good* for appellees.

LADD, J.—O. N. Hull's Second addition to. Cedar
Rapids was platted May 18, 1873. Outlet 1 lies between
a twenty-foot alley, south of block 8, and the right of way
of the Burlington, Cedar Rapids & Northern Railway. . The
outer lines of Hudson street, to the west, and Orange street,
to the east, of said block, extended to said right of way. In
January, 1875, Hull conveyed a lot forty feet wide by one
hundred and twenty-feet in length, north and south, imme-
diately south of the easterly lot of block 8, to one Tlusty.
The north boundary line was twenty feet south of the alley,
and the east line sixty feet west of lot 1 in block 9, leaving
a space corresponding with Orange street extending to the
south line of the alley south of said block. This strip, sixty
feet wide and one hundred and forty feet long, is the ground
in controversy. It was designated on the county auditor's
plat, filed in 1895, as lot 11, and that conveyed to Tlusty
as lot 10, and they may hereafter be referred to by these
numerals. Later, nine lots of like proportions, directly to
the west of lot 10 were sold, leaving between their north
boundary, in addition to the alley, a strip twenty feet wide,

and it is conceded that this was intended as a roadway. To
avoid misapprehension, a part of the plat may be set out:

The law applicable to such a case is too well settled to
require discussion here. See *Hanger v. City of Des Moines,*
109 Iowa, 480, and cases cited. A careful examination of
the evidence, in which there is little or no conflict,
has led us to the conclusion that the land in contro-
versy was dedicated by Hull as a part of the public
highway, and accepted as such by the city. In selling the
lot 10 to Tlusty, he represented it to be a corner lot, and
did likewise in bargaining lot 1 in block 9 to Josepek in
1876. These parties bought in reliance on his statement that
lot 11 was a street. It is the precise width of Orange street,
while the lots sold are twenty feet narrower, and extends far
enough south to connect with the alley below block 9. These

parties fenced their lots, leaving gates into this strip; and the city shortly afterwards dug a ditch on each side of it, through which to drain the water into the river. Hakl, to whom Tlusty transferred his lot, constructed a sidewalk and planted a row of trees in this strip, about eight feet from his lot line, in 1881; and these were six inches in diameter when he sold the property, ten years later. The portion of outlot 1 not conveyed in lots appears to have been unfenced up to 1890, and until then pedestrians, as well as teams and wagons, were accustomed to pass over lot 11, down to the river, and under the railroad bridge to the packing houses. Tlusty says, "There was considerable travel of the people and wagons going through there." Hakl testified that: "There was lots of travel down that street. Farmers hauled wood and hay in there, and went into the alleys and unloaded things there. This continued all the time I lived there. In the winter the city came down there with the snowplows and scraped the snow off. They worked the center of the street in the summer, and they fixed the ditches, and throwed the dirt out of the ditches into the middle of the street." Krolik, who resided in the addition, also testified: "I worked in the packing house from 1877 to 1890. To my own knowl-edge, I know this street was traveled all the time during those years. There were water ways on each side of the street. The street had been considerably traveled during the last eight or nine years. From this street you could get out along the back of the lots in block 9. Before the stock yards put the tracks in there, you could walk down there, and under the bridge. Now you have to walk down there, and through the alley." Since the portion of outlot 1 not con-veyed in lots has been fenced, travelers, in going to the rail-road, turn into the alley below block 9; and a sidewalk has been constructed on the bridge, and along the right of way, for the convenience of people living in the suburbs beyond. But there need be no concern as to the use of this strip of land subsequent to 1890, for it had been traveled as a public

highway for more than ten years prior to that time. That will be assumed to be the time of Hull's death, as Leddle declared he had been executor of his estate about nine years. Also, the deeds recite that Hull was a resident of Linn county, and a status once established is presumed to continue. He had sold the lots on each side of the strip in controversy on the assurance that it was a public street, and acquiesed in its use as such for about fourteen years thereafter. *Manderschid v. City of Dubuque,* 29 Iowa, 73.

The further fact may be added that these executors made no claim whatever to the property, other than by paying taxes levied by the city thereon in 1896 and 1897, and "for prior years." Whether Hull ever paid any is not disclosed by the record, and their exaction by the city after the property had been dedicated did not estop it from setting up its claim that the strip had become a public street. *Getchell v. Benedict,* 57 Iowa, 121; *Hanger v. City of Des Moines, supra.*

Travel may have been more extensive on other streets of the city, but it appears to have been as much here as though laid out under the statute, and "as the circumstances of the surrounding population and their business required." True, it extended no further than the alley south of block 9, but during all the time referred to the land below was uninclosed, and traveled in passing to the river and packing houses. It may have been Hull's thought that a street might be opened to the track, but, whether so or not, his statement with respect to this land, followed by the construction of fences on either side, with gates opening on it, the building of a sidewalk and planting of trees, together with the small improvements by the city, and its use for a public highway so long a time, furnishes very satisfactory evidence of his intention to dedicate. *Hanger v. City of Des Moines, supra.* The extent and character of work by a city, essential to show its acceptance of a street, must depend very largely on the necessity for its improvement. Very

little was required here to keep it in suitable condition for travel, and this appears to have been accomplished in a timely and satisfactory manner. The side ditches were dug and kept open, the middle of the road worked, and the snow cleared away in the winter. So far as the record discloses, this was all that was reasonably necessary, and certainly indicates the city's claim thereto. See *Devoe v. Smeltzer,* 86 Iowa, 385. The criticism of the testimony because coming through interpreters is without merit.—REVERSED.