GEORGE K. WENIG, Appellant, v. CITY OF CEDAR RAPIDS
et al., Appellees.

**DEEDS:** Construction and Operation—Severance of Appurtenances.
1  The owner of real estate has the right and power to sever an
   appurtenance therefrom and to convey the property to another
   without benefit of such incidental rights, and the omission of
   express mention thereof in the deed may, in connection with
   other attendant circumstances, be quite conclusive that sev-
   erance was, in fact, intended and accomplished.

**WATERS AND WATERCOURSES:** Dams—Conveyance of Water
2  **Power.** The owner of an interest in a water power dam, by
   conveying her right and interest therein, divested herself of
   any appurtenant right in the dam or power, and the grantee
   took the same unburdened and undiminished by any right ap-
   purtenant to the right obtained by grantor.

**ADVERSE POSSESSION:** Nature and Requisites—Color of Title or
3  Claim of Right. To maintain title by adverse possession, it is
   essential that the possession must have been under color of
   title or claim of right.

**WATERS AND WATERCOURSES:** Dams—Adverse Possession.
4  Where one purchased a lot under a deed which did not attempt
   to convey the water power and dam which had been previously
   conveyed, and without having believed or supposed he was get-
   ting any property or right other than was described in his deed,

and sought and obtained of the owner permission to use the water power, he did not acquire title, by adverse possession, to the dam and power as appurtenant to his land.

NAVIGABLE WATERS: Boundary Line of Riparian Lots. Where a plat, without showing the length of the lot, showed the same as extending from the street to the water's edge, the high-water mark of the river must be treated as the limit of the lot, as the proprietor could not lawfully plat or convey the land, or by occupation enlarge its area, beyond the high-water line.

NAVIGABLE WATERS: Bed of Stream—Adverse Possession. The title to the bed of a stream being in the state, adverse possession cannot be acquired thereto.

WATERS AND WATERCOURSES: Dams—Right to Water Power— Burden of Proof. A lot owner who seeks injunction to restrain interference with a water power right claimed as being appurtenant to his lot has the burden of establishing his alleged right and title.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

SEPTEMBER 22, 1919.

THE plaintiff, claiming to be the owner of Lot 2, Block 3, in the original town of Cedar Rapids, and of a right appurtenant to said lot to use the water power afforded by a dam in the Cedar River, brings this suit in equity to enjoin and restrain the city of Cedar Rapids and others from alleged encroachment upon said property or interference with said right. The city, claiming to have acquired the title to the dam and water power, denies that plaintiff has any right therein, as an appurtenance to said lot or otherwise, and alleges that said lot is situated wholly outside the stream from which the power is produced, and that plaintiff's title is limited to such lot, without an incidental right to or interest in the power created by the dam. The trial court found for the defendants, and dismissed the bill. Plaintiff appeals.—*Affirmed.*

*Lewis Heins,* and *Redmond & Stewart,* for appellant.

*O. N. Elliott, F. A. Randall,* and *F. F. Dawley,* for appellees.

Weaver, J.—The original site of the city of Cedar Rapids was platted in the year 1843. It included what was then known as "Commercial Street," but, in more recent plats, is designated "First Street." This street was laid substantially parallel with the east bank of the Cedar River, a stream which had been meandered in the then recent government survey of the land. The narrow strip between the street and stream was platted into lots 60 feet wide, fronting on the street. The depth of these lots is not indicated on the plat, but it is quite evident that they were laid out to extend from the street line to the highwater line of the river. Among the lots thus platted was one designated "Lot 2 in Block 3," the title to which and the rights alleged to be appurtenant thereto being the subjects of controversy in this action.

Early in the history of the settlement of the state at this point, efforts were made to improve and utilize the water power afforded by the Cedar River; and, even before a right so to do was obtained from the Federal or state authorities, a dam had been constructed, a short distance up stream from the site of this lot. In 1848, the legislature, by statute, authorized a resurvey of the land between Commercial Street and the river, and its division into lots of a "convenient size, to be used or disposed of for hydraulic or other purposes." In 1853, the legislature further authorized Nicholas B. Brown and three others to construct and maintain a dam across the river at this point; and, within a few years thereafter, such dam was, in fact, built upon the site of the earlier structure. Beginning at or near the east end of this dam, a distance of something more than 200 feet above Lot 2, Block 3, a race was provided, by erecting a

wall or wing extending down the bed of the stream, parallel
to and near the east shore, to the full length of the river
front of said Block 3, the natural bank of the river being
thus made to serve as the east bank of the race.

The manner and course of the transmission of title to
the shore lots mentioned, and to the dam and the water
power thereby furnished, is by no means clearly revealed
in the printed record before us; but it seems to be conced-
ed that, in the early history of the development of this
property, Brown became the owner of Lot 2, Block 3, and
that he also became owner of a large fractional interest in
the dam and power.  Lot 2 was the second or third in or-
der of position below the head of the race, and Lot 1, im-
mediately above it, was owned by one Cooper.  Each erect-
ed and used a mill in connection with his lot, and used the
power afforded by the dam and race.  Whether Brown's
mill was situated on Lot 2 or immediately in the rear of
said lot, with its foundations resting in the bed of the
race, is a matter of controversy; but the record fairly
tends to show that, as originally constructed, it stood
with its east front eight feet west of the east bank of the
race, and was connected with the east shore by a bridge or
platform, and that the mill structure rested upon piling
and stone piers over the bed of the stream.  The history
of the property and of its ownership and control is com-
plicated, and somewhat obscured by litigation between the
proprietors themselves and between the proprietors and
their creditors; but defendants admit that, prior to the
death of Brown, many years ago, he and his associates ac-
quired title to the dam and water power, and that, upon
his decease, his widow, Susan Brown, became the owner of
Lot 2, Block 3.  They also admit that Susan Brown, Mary
L. Brown, and N. E. Brown became the owners of 59/64
of the dam and water power furnished thereby, and allege
that, on November 17, 1900, said owners united in convey-

ing the said 59/64 of said dam and power and appurtenant rights and privileges to one Walter B. Smith, who, on July 7, 1903, conveyed the same to the city of Cedar Rapids. The other 5/64 of said property have been acquired by the Iowa Railway and Light Company.

Prior to the beginning of this action, the city undertook to utilize the dam, race, and water for the construction of an electic light and power plant. In so doing, it sought to reconstruct the raceway in a manner which required an excavation of the eastern bank, a few feet beyond the line to which it had theretofore been maintained. The right so to do was denied by the plaintiff, who is the owner of Lot 2, and who claims also to have acquired a right to the use of the water power for the operation of the so-called "Brown Mill," title to which he also asserts.

It is out of these conflicting claims that this litigation has arisen. The pleadings, as filed, present numerous issues and numerous demands for equitable relief, but the case argued and submitted for the plaintiff on this appeal turns very largely upon the true depth of Lot 2, Block 3, and upon the further question whether the ownership of said property carries with it any appurtenant right in the dam, or to the use of power thereby created. It is the contention of the plaintiff that Lot 2 is 120 feet in depth, measured from the street westward, and that the right to share in the use of the power is appurtenant thereto. According to the defendants' claim, the depth of plaintiff's lot is measured by the distance from the street to the east border of the race, which is 35 feet on the north line and 43 or 44 feet on the south line. It is also defendants' position that the ownership of the shore lots, including Lot 2, has been fully severed from the ownership of the water power, and that the right to use such power is not an appurtenance of said lot.

I. The plaintiff's claim of title to the lot in question

and defendants' claim of title to the dam and water power are traceable to common grantors, the widow and heirs of Nicholas B. Brown. The deed to plaintiff is in ordinary warranty form, and was made by Susan Brown in November, 1901. The lot is described therein solely by reference to the original plat, without stating any measurements, and contains no reference to the dam, water power, or other appurtenances. It may be conceded, for the purposes of the case, that the mere omission from the deed of any express mention of appurtenances is not, of itself, necessarily inconsistent with the conclusion that the grantee therein acquires all the rights and privileges which were incident to the property in the hands of the grantor. On the other hand, it being within the right and power of the owner of real estate to sever an appurtenance therefrom, and to convey the property to another, without benefit of such incidental rights, the omission of express mention thereof in the deed may, in connection with other pertinent circumstances, be quite conclusive that severance was, in fact, intended and accomplished.

1. DEEDS: construction and operation: severance of appurtenances.

Now, the record shows that, on November 17, 1900, one year prior to the making of the deed under which plaintiff claims title, and at a time when Susan Brown, N. E. Brown, and Mary L. Brown were the owners, either in severalty or in common, not only of Lot 2, Block 3, and its appurtenances, if any, but of 59/64 of the dam and of the water power thereby created, they sold and conveyed to Walter B. Smith, by deed of warranty, without exception or reservation, the property described as follows:

2. WATERS AND WATERCOURSES: dams: conveyance of water power.

"An undivided 59/64 of the property known as the Cedar Rapids water power, together with the undivided 59/64 of the dam, raceways, bulkheads, water rights, rights

of flowage and overflowage, water power privileges, franchises and appurtenances pertaining to said Cedar Rapids water power, *together with the land on which the same are situated.*"

The property thus designated, it will be observed, constitutes all the property, right, title, and interest which the Browns severally or in common are shown to have held, owned, or claimed at any time in the dam or water power, or in the rights and privileges connected therewith. It follows quite inevitably that the making and delivery of such conveyance left in Susan Brown the ownership of Lot 2, wholly divested of any appurtenant right in the dam or power, and that Smith took the title to the dam and the power, unburdened and undiminished by any right appurtenant to the lot retained by his said grantor. All the title, rights, and privileges thus acquired by Smith have passed by his subsequent deed to the city of Cedar Rapids; and neither Susan Brown nor plaintiff, as her grantee, can be heard to deny the legal effect of her conveyance. Appellant's title, if any he has, to the alleged appurtenance must be traced to some other source.

II. It is argued for the plaintiff that whatever may be said of the legal efficiency of the deed to Smith as a conveyance of the property, yet, as plaintiff went into possession of the lot and mill in the year 1901, or soon after the conveyance to him by Mrs. Brown, and has retained the same, enjoying some use of the water power, he has thereby acquired title by adverse possession to the use of the dam and power as appurtenant to the lot. The evidence in this respect tends to show that, when plaintiff bought Lot 2, he was fully advised that the water power had already been conveyed by the Browns to Smith.

3. ADVERSE POSSESSION: nature and requisites: color of title or claim of right.

After taking his deed, plaintiff appears to have used the mill, personally or by tenant, to a greater or less ex-

tent for the grinding of feed.  He was an old resident and business man in Cedar Rapids, and was acquainted to a considerable degree with the property and its history.  He says in testimony:

"I knew it when I bought the property that the water power was sold.  I knew it at the time I bought the property.  I knew that is what they said, that they had sold the dam to Walter B. Smith.  I think that was sold just before I bought the property  *  *  *  I did not know that my deed from Susan Brown didn't say anything about the water power.  I did not read the deed at the time I got it.  Didn't anybody read it to me, as I know of.  I acted for myself in getting the property.  I didn't have to contract to buy any water power."

It is true he says he claimed to have acquired the mill, and to be its owner, but he nowhere says or shows that he ever made any claim to have purchased any right to the water power as an appurtenance to the lot.  On the contrary, as we have seen, he distinctly says he bought the lot, knowing that the dam and water power had already been parted with by his grantors to a third party.  Indeed, it is quite apparent that his use of the water power was permissive only.  It does not appear that he ever demanded or obtained the use of such power as his right.  On the contrary, after the city, claiming under its deed from Smith, took possession of the dam, plaintiff applied to the city commissioner in charge thereof for a supply of water, not as a right, but rather as a favor.  Says the commissioner, as a witness:

"Mr. Wenig would sometimes ask me to open the gates and let him have some water.  He never made a demand of me; he asked me to let him have some water if I could.  I don't think he ever claimed to own any water or have a legal right to use the water for the operation of his mill.  My recollection is clear on that subject.  *  *  *  The

last time he asked me for water, he said: 'In about two weeks, I'll have my electric power in, and then I won't have to bother you any more.' "

He further admits that, for a portion of the time while he was in possession of the mill, it was operated by electricity. To a title by adverse possession, it is essential that the possession must have been under color of title or claim of right. There is in this case no color of title" to anything more than is described in the deed as Lot 2 in Block 3, and the buildings thereon.

4. WATERS AND WATERCOURSES: dams: adverse possession.

He says, and other witnesses swear, that he "claimed to own the mill;" but this might well be true, without denying the efficiency of the deed from the Browns to Smith, conveying the dam and power to the latter. That deed, as we have seen, divested the Browns of any appurtenant rights in the dam or power, and their subsequent deed of the lot to plaintiff vested him with no other or greater right than was left in them after the conveyance to Smith. Plaintiff's conduct, as shown in evidence, is entirely consistent with a recognition of the superior right of Smith and his grantees. His seeking and obtaining permission of the city to use the water, if not a distinct recognition of his lack of proprietary right, tends very strongly to sustain the conclusion that his claim of right was limited to the ownership of the property expressly described in his deed. He does not claim to have believed or supposed that he was getting any property or right other than was described in his deed. •To that he is entitled, and no more.

The one debatable question presented by the record is the true depth of Lot 2, Block 3, measured from the street line. The original plat shows the boundary lines on the

north and south sides of the lot as extend-
**5. NAVIGABLE WA-** ing from the street to the water's edge, but
**TERS: boundary**
**line of riparian** their length is not stated.   Of necessity,
**lots.**
the high-water line or mark of the river, if
ascertainable, must be treated as the western limit of the
lot.   Beyond the high-water line, the proprietors could not
lawfully plat the land or convey title to their grantees, nor
could the plaintiff or the Browns, by occupation beyond
such line, so enlarge the area of the lot that a conveyance
by the platted description would vest their grantees with
title to any land not included within the boundaries so
designated.

Naturally, it is difficult, and perhaps impossible, after
the changes incident to a period of 70 years or more, to
trace the original high-water limit with perfect accuracy;
but there are conceded circumstances from which we think
it may be approximated.   At present, the distance from
the street to the race is 35 feet on the north line and 43
or 44 feet on the south line.   So far as shown, the location
of the race between the extension of these lines has never
been changed since its original construction;   and, as the
western wall of the race was concededly erected in the
river bed, and, therefore, west of the high-water mark, it
follows that, if such mark does not coincide with the east
bank of the race, it must fall somewhere between that bank
and the wall which separates the race from the stream.
Witnesses estimate the width of the race at 30 feet, and
the front of the old mill as being 8 feet west of the eastern
bank—the main structure of the mill being supported on
piles and piers over the river.   In other words, the mill be-
ing built in or over the stream, its site constituted no part
of Lot 2, Block 3, which lies wholly east of the stream's
margin, and we are satisfied that the true location is sub-

stantially as claimed by defendants. The
6. NAVIGABLE WA-   title to the bed of the stream being in the
TERS: bed of
stream: ad-        state, except as it had been relinquished
verse possession.
to the builders and owners of the dam,
plaintiff could acquire no title thereto by adverse posses-
sion. See *Board of Park Commissioners v. Taylor*, 133
Iowa 453. Moreover, if the Browns ever had title to the
bed of the race, or to any part of it, as a part of Lot 2,
such title passed from them to Smith, and from him to
the city of Cedar Rapids, by their deed already mentioned,
by which, in express terms, they sold and conveyed, not
merely the dam and raceways, but also "the land on which
they are situated."

Appellant is the plaintiff, and the burden is upon him
to establish the alleged right and title for protection of
which he asks an injunction; and from what we have said,
it is quite clear that the evidence is insuffi-
7. WATERS AND     cient to justify such finding. The decree
WATERCOURSES:
dams: right       dismissing the petition must, therefore, be
to water power:
burden of proof.  affirmed. The record reveals that the de-
fendant city, in prosecuting the improve-
ment of the water power for the production of electricity,
sought to make an excavation on the east bank of the race
in Lot 2, and, being resisted by the plaintiff, began con-
demnation proceedings, in which there was an assessment
of damages in plaintiff's favor. From that assessment an
appeal was taken by one or both parties, and the pro-
ceedings thereon are still pending in the court below; but
nothing said or held by us in the instant case is intended
to operate as an adjudication of plaintiff's claim to such
damages, or of the amount thereof.

The decree of the district court is, therefore, affirmed,
with costs.—*Affirmed.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.