CITY OF CEDAR RAPIDS, Appellee, v. HARRY L. MARSHALL et al., Appellants.

NAVIGABLE WATERS: Riparian Rights—Boundary Line. The line
1   of the "high-water mark" of a navigable river is the boundary
of land abutting upon the river, and not the meander line.

NAVIGABLE WATERS: Riparian Rights—"High-Water Mark." The
2   "high-water mark" of a navigable river is that upper line which
ordinary floods permanently mark along the course of the river.

NAVIGABLE WATERS: Riparian Rights—Cedar River—Title to Bed
3   of Stream. Chapter 4 of the Acts of the Extra Session of the First
General Assembly did not grant to the parties named therein any
right to the bed of the Cedar River.

BOUNDARIES: Acquiescence—Nonowners. Nonowners of land may
4   not so acquiesce in a boundary line as to bind the owner, especially
when the owner is the state.

NAVIGABLE WATERS: Riparian Rights—Cedar River—Jurisdiction.
5   Chapter 16, Section 51, of the Acts of the Extra Session of the
Fifth General Assembly, conferred no jurisdiction upon the city of
Cedar Rapids over the bed of the Cedar River.

BOUNDARIES: Acquiescence—Period Required. Acquiescence alone
6   for a period of less than ten years confers no rights.

QUIETING TITLE: Estoppel—Levy of Assessments by Municipality.
7   A city is not estopped to assert title to land from the fact that it
has levied and collected special assessments against the land.

Headnote 1:  9 C. J. p. 186.  Headnote 2:  9 C. J. p. 193.  Headnote 3: 29 Cyc. p. 360.  Headnote 4:  9 C. J. p. 247 (Anno.)  Headnote 5:  29 Cyc. p. 360.  Headnote 6:  9 C. J. p. 245.  Headnote 7:  21 C. J. p. 1199.

*Appeal from Linn District Court.*—F. O. ELLISON, Judge.

MAY 12, 1925.

AN action in equity to quiet title to certain lands lying along the Cedar River, in the city of Cedar Rapids. It is the contention of the plaintiff that said lands lie within the high-water mark of the river, and that the title to the same was vested in the city. The defendants deny the claim of the plaintiff, and in addition plead abandonment, acquiescence, agreement, and estoppel. The trial court entered a decree in behalf of the plaintiff, and by said decree fixed the location of the line between the property of the plaintiff and that of the defendants. Both parties appeal. The defendants, having perfected their appeal first, are referred to as appellants.—*Affirmed.*

*Deacon, Sargent & Spangler,* for appellants.

*O. N. Elliott,* for appellee.

FAVILLE, C. J.—I. The Cedar River flows through the city of Cedar Rapids in a general southerly direction. The land involved in this litigation lies on the east side of the river. Appellants' property abuts upon the river, and is a part of Lot 1 in Commercial Block in said city. It is conceded by all parties that the Cedar River through the city of Cedar Rapids was meandered by the government surveyors, and that it was in fact, at the time of the government survey, a navigable stream. It is also admitted that the title to the bed and banks of said river below the ordinary high-water mark became vested in the state of Iowa, at the time of the admission of the state into the Union.

In 1902, the twenty-ninth general assembly, by Chapter 210, made provision for the improvement of the channels of meandered streams within the corporate limits of certain cities. It provided for the creation of a river front improvement commission, and provided that the fee-simple title to the bed of the meandered stream should vest in said commission in trust for the public; and the powers and duties of the said commission with respect to the care of said lands were set forth. It appears that, shortly after the passage of said act, a river front improvement commission was organized in appellee city, which proceeded to perform the duties required by said act.

In 1909, the legislature, by Chapter 66, Acts of the Thirty-third General Assembly, vested the control of said meandered streams, and the beds, banks, and waters thereof, in the cities, and provided that the powers previously conferred upon the river front improvement commission should be transferred to and vested in the city council, which was in turn given power to elect a commission, to be known as the river front improvement commission, which should carry out the powers and duties so conferred. The city proceeded under these statutes, and enacted ordinances consistent therewith.

The particular tract of land in controversy is a lot the eastern line of which is 100 feet west of the west line of First Street. The disputed question is as to where the west line of said lot is located. The block in which said lot is located was platted in 1849, and the original plat shows the river boundary to be some 90 feet west of First Street. The government meander line was located approximately 62 feet west from First Street. The meander line, however, is not a boundary line, but one which was run by the government for the purpose of defining the sinuosities of the banks of the stream, and as a means of extending the quantity of the land in a fractional area subject to sale by the government. *Railroad Co. v. Schurmeir,* 7 Wall. (U. S.) 272; *Kraut v. Crawford,* 18 Iowa 549; *Musser v. Hershey,* 42 Iowa 356.

1. NAVIGABLE WATERS: riparian rights: boundary line.

There is no dispute between the parties that the true boundary line is the line of ordinary high-water mark. The controverted question on this branch of the case is as to the true definition of ordinary high-water mark, and the question of fact as to where such ordinary high-water mark is located. Appellee contends that the ordinary high-water mark of the river is at least six feet farther east than the line fixed by the trial court; while appellants contend that the ordinary high-water mark of the river is much farther westward than the line so fixed.

The term "ordinary high-water mark" has been frequently defined by this and many other courts. It is not the line reached by unusual floods, but it is the line to which high water ordina-

2. NAVIGABLE
   WATERS: ripa-
   rian rights:
   "high-water
   mark."

rily reaches. In *Carpenter v. Board of Com. of Hennepin County*, 56 Minn. 513 (58 N. W. 295), it is said:

" 'High-water mark' means what its language imports,—a water mark. It is co-ordinate with the limit of the bed of the water; and that, only, is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes."

This was approved by us in *Bennett v. National Starch Mfg. Co.*, 103 Iowa 207. In that case we said:

"Soil which is submerged so long or so frequently, in ordinary seasons, that vegetation will not grow upon it, may be regarded as part of the bed of the river which overflows it."

In *Houghton v. C., D. & M. R. Co.*, 47 Iowa 370, we discussed the question at length, and held that the high-water mark "* * * is to be regarded as co-ordinate with the limit of the river bed." We said that:

"* * * that only belongs to the river in any proper sense, where its occupancy has been so long continued as to leave a permanent impression of its domain."

See, also, *Welch v. Browning*, 115 Iowa 690; *Board of Park Com. v. Taylor*, 133 Iowa 453; *Merrill v. Cerro Gordo County*, 146 Iowa 325; *Hubbell v. City of Des Moines*, 166 Iowa 581; *State v. Thomas*, 173 Iowa 408.

The difficulty in the case lies not so much in the definition of the term "ordinary high-water mark" as it does in applying the definition to the facts in the case and endeavoring to determine from the evidence just where the line of demarcation exists; or, in other words, the eastern boundary of the true river bed. Were the river and banks in a state of nature at the place in question, the problem would be much easier of solution; but in the last seventy-five years, the changes in the river bank at this place have entirely obliterated all indications on the surface of the natural bed of the stream. At one time there was a steamboat landing at the place in question, and the original bank of the river was cut away, for the purpose of affording access to the landing. A large amount of so-called "fill" has been placed along the river bank at this place during the intervening years.

In the course of time, a substantial cement wall was constructed along the river bank, and eventually a large building was erected upon appellants' lot, the western wall of which was placed upon said cement wall.

The record in the case is very voluminous. A large number of old settlers who had known the river and its condition in the early times testified with regard to the location of buildings that were placed in this vicinity when the city of Cedar Rapids was a small town, and also with regard to the condition along the river banks. It is not easy to apply the testimony of all of these witnesses to the existing condition. A series of trenches were dug near appellants' property, and an examination made of the soil, as disclosed in said trenches. This examination revealed a large amount of fill that had been placed upon the river bank. Eminent geologists testified as witnesses with regard to the line which they testified they discovered to be the line of high-water mark, as shown in the soil in these trenches; while other eminent geologists examining the same trenches testified that the character of the soil therein revealed that the high-water mark of the river was at an entirely different point. Botanists testified as experts, regarding an examination made by them of the banks of the river at some distance below the place in controversy, at which places they determined and fixed the line of high-water mark; and, taking as a basis the elevation of the high-water mark so fixed by them, the elevation of the high-water mark at the place in controversy was computed by expert mathematical calculation.

It appears that, since 1902, a government gauge has been maintained at Cedar Rapids, by which the stage of the waters has been determined; and charts are submitted to us, showing the fluctuations of the stream during said period of time.

It is impossible, within the reasonable limits of an opinion, to set out and review in detail the testimony of the numerous witnesses in the case; nor would it be serviceable so to do. Applying the rule heretofore stated in regard to the ordinary high-water mark, and from a careful examination of the evidence in the case, we are constrained to acquiesce in the conclusion of the trial court that the preponderance of the evidence tends to show that the true high-water mark and boundary line be-

tween the property of appellants and appellee is located 121 feet westerly from the west line of First Street.

II. We now consider the special defenses interposed by appellants.

Appellants contend that their predecessors acquired rights in the river bed by virtue of Chapter 4, Acts of the First General Assembly, convened in extra session, said act having gone into effect in January, 1848. The act authorized certain parties, proprietors of a portion of the town of Cedar Rapids lying along River Street, to resurvey and divide the same into lots of convenient size, and dispose of or use the same for hydraulic or other purposes.

3. NAVIGABLE WATERS: riparian rights: Cedar River: title to bed of stream.

The act in question did not purport to, nor did it, grant to the parties named therein any rights whatever in and to the river bed. The terms of the act make no such grant. This act was before us in *Wenig v. City of Cedar Rapids,* 187 Iowa 40. We therein held that the high-water mark must be treated as the western limit of Lot 2 in Block 3, and said that beyond the high-water mark the proprietors could not lawfully plat the land, nor convey title to their grantees. Furthermore, it appears that the premises in controversy were deeded by a series of mesne conveyances, and that the western boundary of the lot in question was described therein as extending "to the river." The act in question did not grant to the predecessors of appellants any title to or rights in the land in the river bed lying below the high-water mark.

III. Appellants contend that the boundary line contended for by them has been established by acquiescence and agreement. The contention is that appellee, by the action of its council, entered into an agreement with the then owners of the premises, by which the boundary line was fixed and established, and that thereafter, in reliance upon such an agreement, the wall upon which appellants' building rests, was constructed.

4. BOUNDARIES: acquiescence: nonowners.

Of course it is fundamental that there can be no acquiescence by a party who has no interest in the property, and, therefore, no power to acquiesce. We therefore first ascertain whether the city had any title to or legal interest in the property

which it now claims, so that it had the power to acquiesce in the fixing of the boundary line.

'Appellants contend that, in the year 1847, by Chapter 117, Acts of the First General Assembly, provision was made by which jurisdiction over the river bed was vested by the legislature in the town. of Cedar Rapids, and that such right subsequently passed to appellee city. Said act provided that any incorporated town in this state "situated on a navigable stream, shall have power to regulate the banks, shores and wharves in front of said town, and the same shall be deemed a part of the corporation and within the jurisdiction of the trustees or authorities thereof."

If it be conceded that said Acts of the First General Assembly gave the incorporated town of Cedar Rapids jurisdiction over the banks and shores of the river "in front of said town," the act was repealed by Section 28 of the Code of 1851, and similar provisions were not embodied in said Code, nor enacted in subsequent Codes.

Furthermore, appellee. city was first created by special charter and the general statute does not apply to cities operating under special charter, unless especially made so by the legislature. *Burke v. Jeffries*, 20 Iowa 145; *Town of Decorah v. Bullis*, 25 Iowa 12.

Appellants also rely upon Section 51, Chapter 16, Acts of the Extra Session of the Fifth General Assembly, by which chapter the special charter of the city of Cedar Rapids was granted. Said act provides that:

"The council shall have the control of the streets and alleys and public grounds of the city of Cedar Rapids, and may cause sidewalks to be paved in the same."

The city of Cedar Rapids was also, by said act, invested, as a lawful owner, with all of the property belonging to the town of Cedar Rapids.

We cannot concur in appellants' contention that this act is broad enough to confer jurisdiction upon the city of Cedar Rapids over the river bed of the Cedar River. The control of

5. NAVIGABLE
WATERS: ripa-
rian rights:
Cedar River:
jurisdiction.

the streets and alleys and public grounds of the city of Cedar Rapids and the authority to "cause sidewalks to be paved in the same" did not vest in the council of the city of Cedar Rapids any authority over or control of the river bed of the Cedar River, although the same lay within the corporate limits of said city. Appellee city, therefore, was not vested with any. rights in or control over the river bed of the Cedar River until the enactment of Chapter 66, Acts of the Thirty-third General Assembly, which became effective April 3, 1909.

It must be evident that the city officials could not, by any act or agreement, acquiesce in a boundary line that would be binding upon the state at the time the title to the premises in question was vested in the state, and when the city had no authority over said premises. Whether there was acquiescence in the boundary line by the city officials thereafter is immaterial, because this action was commenced within a period of ten years from the time the city was vested with control of said premises. As bearing on the question discussed, see *Board of Park Com. v. Taylor,* supra; *Des Moines Ind. Sch. Dist. v. McClure,* 170 Iowa 191.

. Appellants contend that this action is, in effect, an action for the establishment of a lost boundary, and that the doctrine of acquiescence recognized in Section 4233, Code of 1897, in

6. BOUNDARIES:
acquiescence:
period required.

such proceedings, should be applied in this case. The action was not one to establish a lost boundary, but one to quiet title to a tract of land; and, even though it be treated as though the action were one for the establishment of a lost boundary, the doctrine of acquiescence would not be available to appellants, for the reason that appellee had not been vested with control of the premises for a period of ten years before this action was commenced, and hence would not, in any event, be bound by the doctrine of acquiescence.

IV. It is contended that appellee has levied special assessments against the property in question occupied by appellants, and collected such special assessments, and that, therefore, ap-

7. QUIETING TITLE:
estoppel: levy
of assessments
by municipality.

pellee is estopped from claiming ownership in the property. We expressly held to the contrary in *Board of Park Com. v. Taylor,* supra. See,

also, *Des Moines Ind. Sch. Dist. v. McClure,* supra; *Hull v. City of Cedar Rapids,* 111 Iowa 466; *City of Lake City v. Fulkerson,* 122 Iowa 569; *City of Cedar Rapids v. Young,* 119 Iowa 552.

We find nothing in the record to sustain appellants' claim of estoppel; nor do we find that there is any evidence in the record to sustain appellants' claim of abandonment.

We reach the conclusion that the special defenses urged by appellants are not available to them as defeating appellee's right to the land in the bed of the Cedar River below the ordinary high-water mark. The sole question for final determination, then, is the fact question as to the proper location of the ordinary high-water mark. The fact question is a close one, under the record in the case. It is exceedingly difficult to establish the ordinary high-water mark, under the circumstances disclosed, with absolute accuracy and unquestioned certainty.

Upon an examination of the whole record, we are disposed to concur in the finding of the trial court and in its decree establishing the line at 121 feet westerly from First Street. The decree of the trial court will, therefore, be, in all respects,—*Affirmed.*

Evans, Arthur, and Albert, JJ., concur.