MARY CURTIS, Appellee, v. CHARLES SCHMIDT, Appellant.

No. 40821.

JUNE 20, 1931.

REHEARING DENIED OCTOBER 5, 1931.

Davis & Davis, for appellee.

Henry Negus and E. A. Baldwin, for appellant.

GRIMM, J.—Prior to October 2, 1911, the plaintiff owned, in fee simple, certain real estate located immediately south of Iowa City, Iowa. The property is bounded on the east by the Iowa River and on the west by State Highway No. 161. On

October 2, 1911, plaintiff and her husband, Ira Curtis, conveyed, by warranty deed, to the defendant, Charles Schmidt, a strip from the north portion of said piece of land, which strip extended from the highway to the river. The deed contained the following restrictive covenant:

"Grantee hereby covenants and agrees to remove barn on said premises within one year from date, and that no building shall be erected by him, his heirs or grantees, on said premises East of a line parallel with the West line of said premises and located 100 feet East of the East line of the highway in front thereof."

The property sold has approximately 160 feet frontage on said primary highway No. 161 and is approximately 140 feet deep on the north and 300 feet deep on the south line. The south line of the plaintiff's dwelling house is about 30 feet from the division fence. Some sheds and outhouses have been built on the west end of the property, adjacent to the division fence between the two properties. The river referred to is the Iowa River and flows in a southeasterly direction, east of the properties in question. The barn referred to in the restrictive clause hereinbefore quoted had been used as a slaughter-house and it was removed.

The plaintiff resides on the portion of the original tract not sold to the defendant, and in addition to using the premises as a residence, it is also used for greenhouse purposes.

On February 1, 1929, the plaintiff filed her petition in equity in the District Court of Johnson County, Iowa. A temporary injunction was issued on March 8, 1929. Thereafter a stipulation was entered into, without prejudice to the rights of the parties, whereby the defendant was permitted to temporarily use the structures in controversy for the purpose of getting out some sand and gravel for a building contract then in progress in Iowa City.

On May 16, 1930, an amended and substituted petition was filed. The plaintiff's pleadings allege in substance that the restrictive covenant was placed in the deed for the purpose of restricting and preventing the grantee named in said deed, or any person or persons by, through or under him, from placing any building upon said premises so conveyed, east of the 100

foot line, that the restrictive covenant was a part of the consideration for the deed and that it was understood between the plaintiff and the defendant that the covenant was to prevent the erection of any structure on the restricted area conveyed.

The defendant answered by way of general denial, with some affirmative allegations, which need not be here considered.

It appears, without dispute, that several structures have been erected by the defendant on the defendant's property east of the 100 foot line. These are structures used by the defendant in operating a sand and gravel business. The sand is sucked out of the river bed and elevated up to certain portions of the structure where it is permitted to pass over screens and is thus prepared for sale as a merchantable product. One of the structures is described by a civil engineer in the following terms:

"The structure has a wooden superstructure raised on a substantial concrete foundation, which foundation is about 23 feet in an easterly-westerly direction and approximately 12 feet off the main part of the foundation and frame approximately north-south direction extending southerly from the main part of this foundation are walls acting as bins for the discharge of the separated materials. The structure is about 28 feet high on the north side of the structure to the top of the main part with an elevator extending about 8 feet higher above the main part. * * * The superstructure is a wooden superstructure housing the machinery for separating the materials. * * * The hopper is a building in which sand is discharged to be loaded into trucks."

There is on the premises a large derrick, with hoisting machinery, used for elevating and swinging clam-shell buckets full of sand.

The defendant, Charles Schmidt, has the following to say in reference to some of these buildings:

"I constructed a screening plant along the river bank there during the early part of 1929. I first built up a concrete wall to get up above the high water and then put a partition in to make two bins for sand to drop down into, and on top of the wall I have a wooden structure with a screen and a rock crusher on it."

Numerous photographs of these structures are introduced

in evidence. The trial court found for the plaintiff and directed the removal of the sand screen and cement foundation and all buildings and structures erected east of the 100 foot line. The defendant appeals.

I. One of the questions lying at the threshold of this case is what was the purpose and intention of the parties in inserting the restrictive covenant contained in the deed? The plaintiff's husband, Ira Curtis, testified on the subject as follows:

"The restrictive covenant was incorporated in said deed at the instance and request of Mrs. Curtis and myself. We insisted upon that restriction or reservation being incorporated in Exhibit 'F' (the deed) so there would be no obstruction of the river view. It was also detrimental to the plants."

The witness, Tom Davis, who was the real estate agent who negotiated the original transaction between the plaintiff and the defendant, testified on the subject as follows:

"The provision or restriction in the deed conveying this property to Charles Schmidt by Mary Curtis and her husband regarding buildings east of a one hundred foot line was one of the provisions of the sale suggested by Mr. Curtis. His reason was he didn't want the view from the river obstructed by any building or anything of that sort."

On cross-examination, he said:

"Curtis' only reason was it would interfere with the view. There was an old slaughter-house there and that was to be torn down."

All this appears to have been clearly understood by the defendant. He testified upon the subject, among other things, as follows:

"I read it (the restrictive covenant) then and understood what it said * * * I read that no buildings were to be erected east of a line * * * and I knew what that meant. I knew that restriction was in the deed when I accepted it which was a provision that I should not locate any building upon that portion of that ground. I read and understood it at that time."

In Bauby v. Krasow, 139 Atl. 508 (Conn.), the court had

under consideration a restrictive reservation in a deed. The court said:

"In the absence of an express statement in the covenant itself the intention of the parties must ordinarily be determined as a matter of fair inference from the language of the covenant, the nature of the restriction granted or reserved and all the circumstances surrounding the transaction."

Manifestly, if the objections to the barn or slaughter-house arose by reason of the use to which it had been put, a very simple restrictive covenant preventing the use of any of the buildings on the said premises for slaughter-house purposes would very efficiently convey that idea. The fact that the restriction in the deed is not as to the use to be made of the building but that the one building then on the restricted area shall be removed, and no other buildings shall be erected, is very persuasive evidence that the grantors desired to protect the view across the restricted area. There is nothing in the record to warrant the belief that the grantors were only seeking to get rid of a building used for slaughter-house purposes or to get rid of the particular building which had been used for slaughter-house purposes. The covenant expressly prohibits the erection of any buildings on the restricted area. On the whole record, we think it very clearly appears that the parties intended by the restrictive covenant to obtain and retain an unobstructed view north and easterly from the plaintiff's premises over the restricted area to the river and beyond.

II. One of the principal contentions of the appellant is that the structures found upon the restricted area are not buildings. This question is the subject of a somewhat elaborate note in 49 A. L. R., page 1364. The text contains the following terse expression, which we think clearly states the rule:

"Generally, as will appear from the analysis of the cases set out in this annotation, there is a strong tendency on the part of the courts to construe the term 'building,' as used in restrictive covenants, with a view towards giving effect to the manifest intention and purposes of the parties; and, to that end, to extend the term so as to cover some structures or conditions that would

not fall within the strict lexicographical definition of the word 'building.' ''

In Nussey v. Provincial Bill Posting Co., (1909) 1 Ch. (Eng.) 734, 2 B. R. C. 425, 16 Ann. Cas. 222—C. A., a structure 156 feet long and 15 feet high, upon which the trade of bill posting was carried on, was considered a building. To the same effect are the following English cases: Pocock v. Gilham (1883) 1 Cab. & El. (Eng.) 104; Foster v. Fraser (1893) 3 Ch. (Eng.) 158.

In MacGregor v. Linney (1905), 27 Ohio C. C. 490, it was held that a board fence 8 or more feet in height, shutting off a view, is a building within the meaning of a deed providing against the erection of a building. In Wright v. Evans (1867) 2 Abb. Pr. N. S. (N. Y.) 308, the court said: ''In construing a word like this, in an instrument, we are not confined to its strict and literal meaning, but it is to be taken in the sense which the parties intended, and what they intended is to be gathered from the whole instrument and the subject-matter.''

In Long Eaton Recreation Grounds Co. v. Midland R. Co. (1902), 2 K. B. (Eng.) 574—C. A., a railway embankment was held to be a building violating a covenant not to erect on the premises any building other than a private dwelling house. The court said:

''The covenant was intended to secure that nothing but private dwelling-houses of a certain value should face Springfield Avenue; and to place an embankment there, instead of private houses, is certainly a breach of what was intended to be provided for by the covenant. It is said that there has been no breach because an embankment is not a building, but what is provided for is that, if any building is to be erected on the land, it is to be a private house, and that would, in my judgment, exclude, and was intended to exclude, anything in the nature of an embankment. In substance the covenant is that nothing but a private dwelling shall be erected on the land. If, however, it is necessary to say whether a railway embankment can be covered by the word 'building,' I see no reason for saying that it cannot. A building is not necessarily limited to a structure of bricks and mortar. There is nothing to negative this view, and it seems to me to be obvious that it comes within the sense of the covenant,

and that to hold otherwise would be to defeat the object of the parties."

In Blakemore v. Stanley, (1893) 159 Mass. 6, 33 N. E. 689, a tent which was fitted up with a stove and other furniture, and used by its owner to live in, was held to be a building in contemplation of a covenant against buildings.

In Buck v. Adams, (1889) 45 N. J. Eq. 552, 17 Atl. 961, a pavilion raised about 18 feet above the ground consisting of a frame structure open on all sides, with a roof at an angle of 30 degrees, was held to be a violation of a restriction providing that buildings were not to be erected within a certain number of feet of the front line of the premises.

In State v. Gibson, 97 Iowa 416, this court had under consideration an indictment charging the defendant with breaking and entering a certain building, to wit, a corn crib. The structure was an ordinary crib, constructed of wooden posts and boards, with flooring and a roof, but without doors or windows, and containing only an opening near the roof into which corn was shoveled. The court said:

"A 'building' has been defined to be 'a fabric, or edifice,' constructed for use or convenience; as a house, a church, a shop. It must be permanent, and designed for the habitation of men or animals, or the shelter of property.' 2 Am. & Eng. Enc. Law, 601. It was said in Railroad Co. v. Vanderpool, 11 Wis. 119, that 'the word "building," as a noun, has a common, well-understood meaning, * * * and includes only those which have a capacity to contain, and are designed for the habitation of man or animals, or the sheltering of property.' We are not prepared to assent to the statement that a structure, to be a building, must be permanent; nor do we concede that the definition last quoted is sufficiently broad to include all structures which may rightfully be classed as buildings under the statute under consideration; but we are of the opinion that the jury were authorized to find that the crib in question was a building, within the meaning of either of the definitions given. It was so constructed as to be of a permanent character, and was specially designed for the storage of corn, which is a commodity of value for use and sale. That the crib was a building, within the meaning of the statute,

is so clear that the jury would not have been justified in finding that it was not.''

In Melson v. Ormsby, 169 Iowa 522, this court said:

''In construing conditions or restrictions in a deed, such as are here under consideration, it is important to determine the intention of the parties in making the restrictions, and the object and purpose to be attained by their enforcement. Courts of equity, in enforcing restrictions of this sort, will look to the purpose intended to be accomplished by the enforcement as the same appears to have been in the minds of the parties at the time of the making of the restriction.''

In City of Concord v. Morgan, 64 Atl. 725 (N. H.), the court had under consideration a claimed violation of a city ordinance establishing a fire precinct and providing that no person shall use any ''engine in any building.'' An engine was being used in a structure described as follows:

''The structure is 60 feet long and 30 feet wide and consists of a gable roof made of boards and roofing paper and supported by three rows of posts, the outside rows being 9 feet high and the middle row 12 feet high. About three-fourths of one side of the structure is covered with boards separated by open spaces, the upper edge of the topmost board being some five feet from the ground. The other side is at times closed with piles of wood. Otherwise the sides and ends of the structure are open. The structure is located in the defendant's wood yard and he uses it in connection with his business.''

The court defines a building in the following language:

''In other words, all permanent structures intended to shelter human beings or domestic animals, or to receive, retain, or confine the goods in which a person deals, or to house the tools or machinery he uses or the persons he employs in his business, are commonly called 'buildings.' State v. Garity, 46 N. H. 61, Smart v. Hart, 75 Wis. 471.''

The court continuing said:

''In other words, it is a permanent structure adapted to the peculiar requirements of his business, and used by him to

store the goods in which he deals and the machinery and men he employs in his business. Consequently, it is a 'building' within the ordinary meaning of the word.''

In State v. Sanders, 106 Pac. 1029 (Kan.), the court held that a dugout or cave 13 feet long and 10 feet wide and 7 feet deep, mostly below the surface of the ground, covered with a roof and entered through a door made of lumber, securely fastened to the structure and used for the storage and preservation of victuals, vegetables and the like, is a building within the meaning of a Crimes Act of Kansas.

Many other cases might be cited. Moreover, the courts are not in complete harmony upon what constitutes a ''building.'' Much depends upon the peculiar facts and circumstances of each particular case. No hard and fast general rule can be stated or adopted.

When we consider the purpose of the restriction in this case as shown by the evidence and the facts and circumstances appearing in the case and from all of which it satisfactorily appears that the primary purpose of the grantor was to retain a view from the grantor's premises north and northeast of the river and beyond, it follows, in the light of the better reasoned of the adjudicated cases, that the structures erected and maintained on the restricted area are covered by the restrictions.

The barn was not to be removed because it was obnoxious in appearance or was being improperly used. It was evidently to be removed because it was an obstruction to a plain view up the river. The restriction is not confined to any particular kind of a building, such as a wooden building or a brick building or a stone building, but any building is prohibited, manifestly, because it would be an obstruction to the view. In light of the evident purpose of the restriction in this case, the word ''building'' is not to be considered in its narrow sense, but more in the sense of any structure which obstructs the view.

 III. It is the contention of the defendant that these buildings were not located on the restricted area, but rather on the river bed belonging to the state and for which the defendant procured a lease. It appears that the Iowa River at this point was originally navigable, but that later, by an Act of Congress, it was declared non-navigable. See Section 9840, U. S. Compiled

Statutes Ann. (1916), Vol. 10; Sec. 9841, U. S. Compiled Statutes Ann. (1916), Vol. 10; Sec. 31 U. S. Code Ann. Title 33, page 26.

It is conceded for the purposes of this case that the defendant's ownership is only to the high-water mark. Therefore, it is unnecessary for us to deal with the effect of these statutes on the scope of defendant's ownership. The question of what is the high-water mark has frequently been before this court. We shall not undertake to collect the cases here. The subject has been recently covered in City of Cedar Rapids v. Marshall, 199 Iowa, 1262. There are many definitions by various authorities of what constitutes a high-water mark, but this court said, in defining high-water mark, in the Marshall case, supra:

" 'Soil which is submerged so long or so frequently, in ordinary seasons, that vegetation will not grow upon it, may be regarded as part of the bed of the river which overflows it.' * * * 'that only belongs to the river in any proper sense, where its occupancy has been so long continued as to leave a permanent impression of its domain.' "

Exhibit "A" in the record in this case is a photograph of one side of the sand plant in question. A professor in the college of engineering in the State University of Iowa made observation and took the measurements of the structures near the river bank. As a witness, he testified, among other things:

"I made observation with reference to the land located between the structure shown in plaintiff's Exhibit 'A' and the water front. On that land there were growing the usual weeds that are along a river and some trees of substantial size, willows, some willows between the structure and the water up to a diameter of about four inches. There were two or three maple trees in the location of the structure, one no more distant from the water's edge than the structure itself and eight inches in diameter, one maple tree about sixteen feet from the water's edge at that time, a maple tree four inches in diameter and fifty or sixty feet northerly from the structure along the river bank. Plaintiff's Exhibit 'B' (another view of the structure) is a fair representation of the view taken from where the camera was located in Exhibit 'A,' looking in a southeasterly direction along

the water's edge. Part of the vegetation I have described is shown in the picture and some of the trees. I have had some occasion to observe the nature of vegetation and trees that grow on ground above the highwater mark of a river. * * * My observation indicates such trees as I observed down there and such as I have described, do not grow where the stream continually flows."

Ira Curtis, the plaintiff's husband, himself a nurseryman, testified as follows:

"There was vegetation growing between this structure shown in Exhibit 'C' and the usual or ordinary course of the water in the river east of it."

This witness testified that the structure is between 40 and 50 feet west of the high-water mark. At another time, in describing the vegetation between the structures and the river, he said: "That vegetation consists of 'weeds, ferns, trees, and I have seen blue grass in there.'"

On rebuttal, the witness Holt testified, among other things, as follows:

"I observed the vegetation east of the structure which is there designated 'screens.' I observed there were weeds and willow trees east of the structure marked 'screens.' There are willow trees between the screen structure and the water, there are willows and two maples north, slightly north of the screen structure, just along the bank of the river. * * * It has been my observation maple trees do not ordinarily grow below what I understand to be the high water mark."

On cross-examination of his rebuttal testimony, this witness said:

"One of these maple trees was just a few feet north of the concrete foundation. I mean a distance of 20 feet. The larger maple tree to which I refer would be north of approximately the middle point of the screen structure or a little bit east of that mid point and approximately 20 feet north of the foundation. It would be about 8 inches in diameter. Not very tall. I would call it a scrub tree consequently, and estimate height of 18 to 20 or 25 feet. I estimate there were no maple trees within 20 feet

of the structure. There is much material east of the structure. I said I saw some willows growing there which customarily grow in wet places. I don't know the name water willow. They frequently grow very close to the water's edge. It was the same day these pictures were taken. This maple tree was a soft maple. There may be different kinds of soft maples. I am not botanist enough to distinguish among the different kinds of soft maple. The tree I saw growing in that place I have seen trees like it growing on upland. I believe it was a regular soft maple. This maple tree was the same kind of a maple tree you see in this climate in different places.''

There is some dispute in the evidence upon this question, but after a careful examination of the several photographs and all of the evidence introduced in the record upon the subject, we are satisfied the court correctly held that all of these structures under consideration are on the restricted area.

It follows that the trial court correctly held, and the cause must be, and is,—Affirmed.

FAVILLE, C. J., and EVANS, STEVENS, ALBERT, MORLING, WAGNER and KINDIG, JJ., concur.