## HARDIN *v*. JORDAN.

*(Circuit Court, N. D. Illinois. June 4, 1883.)*

1. EJECTMENT—PATENTS FOR LANDS UPON NAVIGABLE WATERS.

   Patents, by the general government, of public lands bordering on navigable lakes are not limited by the meander lines. The purchaser of lands from the United States, when the plats and field-notes show that it is bounded on one side by a navigable lake, takes to the low-water mark of such lake.

2. SAME—LAND BETWEEN HIGH AND LOW WATER LINE.

   The commissioners of the general land-office are not justified in surveying land which lies between high and low water mark upon the margin of a navigable lake, and allowing the same to be entered as unsurveyed and unsold lands; and a patent issued to a purchaser for such land is void, as against the holder of the original title bounded upon the water-line. But where, by the proof, it appears that at the time of the original survey there was a wide belt of substantially dry land running through the entire tract surveyed, and lying

beyond the low-water line of such lake, and separating such lake from another body of water, *held*, that as to such land the government had a right to survey and issue patents which would vest a good title thereto.

At Law.

*Barton & Chamberlain*, for plaintiff.

*J. I. Bennett* and *Edsall & Hawley*, for defendant.

BLODGETT, J. This is an action of ejectment by which plaintiff seeks to recover from the defendant the fractional S. E. ¼ of section 19, the fractional N. E. ¼ of section 30, and the E. fraction of the S. E. ¼ of section 30, all in township 37 N., range 15 E. of the third P. M., situate in the county of Cook and state of Illinois, together with the accretions and relictions forming a part thereof. The proof shows that on the twentieth day of December, 1841, a patent was duly issued from the general land-office of the United States, conveying in fee to John Holbrook the parcels of land in question, "according to the official plat of the survey of said land returned to the general land-office by the surveyor general." From copies of the original plat and field-notes in evidence in this case, it appears that the east side of the two first-named parcels of land in question, and the west side of the last-named parcel, abutted upon a body of water designated upon the plat as a "navigable lake," and that meander lines were run along what purported to be this water boundary, and the plaintiff's proof shows that she is now seized by a series of mesne conveyances of this Holbrook title. In 1874, by an order of the commissioner of the general land-office, a survey was made of this so-called navigable lake by extending the original survey lines into and across the same, and what purported by said original plat to be the bed of this navigable lake was, by this last-mentioned survey, cut up into the usual subdivisions of government surveys, and patents were issued therefor to the purchasers, whose titles under said patent have, by mesne conveyances, become vested in the defendant.

The proof shows that the land in question is but a short distance from the southern rim or shore of Lake Michigan, and east of the Calumet river; that the surface of even the highest portions is but a few feet above the water of Lake Michigan and the river; that for some causes, not explained by the proof, the height of the water of Lake Michigan varies or fluctuates about four or five feet,—that is, the extreme high-water mark is about four feet above the extreme low-water mark,—this fluctuation not occuring at stated intervals like a tide, but several years sometimes elapses between those extremes of high and low water; that there is no appreciable difference be-

tween the height or the water in the Calumet and that of Lake Michigan, and that the waters of the river rise and fall with those of the lake; and that the water of this so-called navigable lake being connected with Lake Michigan, and Calumet and Wolf rivers, is affected by this rise and fall of Lake Michigan. It also appears that the height of the water in this navigable lake is also affected, to some extent, by the spring and fall freshets and summer droughts; that in times of high water in Lake Michigan, and in the spring and fall freshets, the water-line of this navigable lake, indicated on the plat, is at or near the meander lines of the original survey, so that the meander lines indicate, with substantial certainty, the high-water line, while in times of low water the water-line recedes from the meander lines so as to leave a wide margin of grassy meadow land between the meander line and the low-water line. There is, therefore, between this meander line and the low-water line a belt of grassy meadow land from 40 to 80 rods wide, which, in an ordinarily dry season, can be used for hay, meadow, or pasturage. The center line of section 19, and the center line of section 30, if produced eastward from this meander line, will strike into the body of permanent water, while the south line of section 30, if produced west from the meander line of the east fraction of the S. E. fractional quarter of section 30, will strike the body of permanent water. I say permanent water, because the proof shows that the bottom or lowest part of the bed of this lake is from two to three feet below the surface of Lake Michigan when at its lowest point.

The proof in this case satisfies me that there has been no marked change in the character of this land, in the height to which the water rises and falls, since the original government survey in 1835. The construction of the harbor at the mouth of the Calumet river may have slightly modified the effect which the rise and fall of the water in Lake Michigan has upon the water in this meandered lake; but Lake Michigan and the Calumet are so close to and connected with this meandered lake that the variation in the height of the water in Lake Michigan must affect the height of this adjacent meandered pond or lake. This body of water, called on the original plat "Navigable Lake," in fact is, and at the time of the first survey undoubtedly was, divided by a low ridge running nearly north and south, into two lakes or ponds, such ridge being nearly in the same line and direction as would be shown by the east line of sections 19 and 30, if produced from the north meander line of said lake; the western of these two lakes having acquired the local name or designation

of Hyde lake, and the eastern one of these lakes—that is, the one lying east of the ridge that I have mentioned—being locally known as Wolf lake. The north half of this ridge was, undoubtedly, at the time of the original survey, as appears from the proof, covered with a growth of trees sufficiently large to be used for timber purposes, and thereby showing such ridge to have been substantially dry land to the extent upon which the timber stood on it for many years prior to the time of such survey, while the central portion of such ridge is lower, and is covered mainly with coarse slough grass. Wolf lake, as it is called, has its natural and ordinary outlet into Lake Michigan, through what is known as Wolf river, but this outlet is liable to be closed by the washing up of sand from Lake Michigan, and when so closed it is probable that the waters of Wolf lake may have risen high enough to cover this ridge, so as to make the two lakes temporarily one sheet or body of water. There is a natural channel leading from Hyde lake into the Calumet river, and by this channel the water in Hyde lake promptly responds to the rise and fall of the water in the Calumet and Lake Michigan; but there was no natural channel through this ridge between Hyde and Wolf lakes, and the two bodies of water were only blended into one when the water from any cause was high enough to overflow the lowest part of this ridge. In times of very low water the water of Hyde lake recedes so as to leave a wide margin of grassy meadow land between the apex of this ridge and the east low-water line of Hyde lake, which can be used for pasturage or meadow land. Upon the belt of land alternately dry or covered with water, which lies between the original meander lines of the fractional S. E. $\frac{1}{4}$ of section 19, and the fractional N. E. $\frac{1}{4}$ of section 30, and the east fraction of the S. E. $\frac{1}{4}$ of section 30, and the lower water-line of Hyde lake, defendant has entered by his tenants, and he also claims title thereto under such of his patents of 1882 as purport to cover this land.

Upon the trial of this cause I could get no very definite statement from plaintiff's attorneys as to what they deemed the extent of her claim; but I understood them as insisting that, inasmuch as the plat of the original survey showed each of these tracts to be bounded on one side by this navigable lake, the grant under the Holbrook patent gives plaintiff title to the entire area covered by the lake; at least, their argument proceeds on that assumption. I think, however, that the natural physical facts must control, even against this plat, by which, it may be said, Holbrook purchased; that is to say, there is and was, at the time of the old survey, two lakes instead of one. There was

a ridge, substantially dry, separating them, and this ridge was never surveyed. The government had the right, in 1874, to survey this dry ridge which had never been surveyed, and put it in market and sell it, and the purchasers of this ridge would have the same right to be bounded by the water on the west, that Holbrook, and those deducing title from him, has to be bounded by the line of permanent water on the west side of the lake. I do not think there is any land involved in this controversy that can be called or designated as accretions or relictions belonging to the fractions covered by the Holbrook patent; that is, none of this belt of low grassy land lying between the meander lines and the low-water lines of Hyde lake has been deposited or made there since the original survey, so as to be said to be an accretion, nor has the water permanently receded from any part of this land, so as to give this belt of land the full character of a reliction, or land from which the water has receded and left it permanently dry. I have no doubt, from the proof in this case, that when this land was surveyed in 1835, as now, the margins between these meander lines and the low-water lines were, at times, covered with water, so that this belt formed part of Hyde lake at high water, and that at times it would be dry; the fact whether this belt or margin was dry land, or part of the lake, depending upon the height of the water in Hyde lake. Inasmuch, therefore, as Holbrook's land was represented on the government plats as bounded by this lake, I have no doubt that the owners of his title have the right to this margin between high and low water mark. Having given Holbrook, and those claiming through him, the right to this water boundary, the government could not, by a subsequent survey and sale, defeat the title which Holbrook had acquired.

This case is essentially, in all its features, like the case of *Forsyth* v. *Smale*, decided by the learned circuit judge of this court, and reported in 7 Biss. 201, and I feel fully justified by my own convictions in following in this case the conclusions of the circuit judge in that. I do not deem it necessary to decide or discuss, for the purposes of this case, who owns the fee of the body of this lake within the area of permanent water; it may rest in the state of Illinois by virtue of its attributes of sovereignty, or the property right may rest in the United States. What I do intend to decide is that the plaintiff, claiming under the Holbrook patent, has the right to go to the permanent water-line; that the meander lines run upon what is represented on the plat as the margin of this navigable lake are not boundaries of these fractional tracts, but were run only as a means

of ascertaining the quantity of land in the fraction, and do not, therefore, limit the Holbrook grant.

I therefore find that the plaintiff, at the time when, etc., was seized in fee of the land between the meander lines east of the S. E. fractional ¼ of section 19, and the N. E. fractional ¼ of section 30, and the meander lines on the west side of the east fraction of the S. E. ¼ of section 30 and the waters of Hyde lake, and that the defendant is guilty of having entered upon the same and ejected the plaintiff therefrom.

The defendant is, therefore, found guilty to the extent named.

---

In *Forsyth* v. *Smale*, cited above, the court follows the principles decided by the supreme court in the case of *Railroad Co.* v. *Schurmeier*, 7 Wall. 272. In that case there was a tract of land surveyed on the Mississippi river, a meander line was run, outside of which was the tract of land in controversy, which tract was claimed by the railway company by virtue of a grant from the government to the state of Minnesota, but which was also claimed by the party who had entered the land bounded by the river. * * * The question was whether the patent included the land outside of the meander line, and which was sometimes covered by water and sometimes bare. The supreme court held that the patentee had the better title to the land because covered by his patent; that the meander line was run for the purpose of ascertaining the quantity of land, the river still remaining the boundary thereof. In this case the supreme court laid down the following principles:

"Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of land in the fraction subject to sale, and which is to be paid for by the purchaser."

"In preparing the official plat from the field-notes the meander line is represented as the border line of the stream, but the water-course and not the meander line is the boundary."

"Proprietors bordering on streams not navigable, unless restricted by the terms of the grant, hold to the center of the stream; * * * but upon navigable rivers, the better opinion is that the proprietor under title from the United States holds only to the stream."

"Rivers were not regarded as navigable in the common-law sense, unless the waters were affected by the ebb and flow of the tide; but it is quite clear that congress did not employ the words 'navigable' and 'not navigable' in that sense, as usually understood in legal decisions. On the contrary, it is obvious that the words were employed without respect to the ebb and flow of the tide, as they were applied to territory situated far above tide-waters, and in which there were no salt-water streams." See *St. Paul, S. & T. F. R. Co.* v. *First Div., etc.*, 26 Minn. 31, [S. C. 1 N. W. REP. 580,] and *Hoboken* v. *Pennsylvania R. Co., ante*, 816, and notes.                    S. E. HALL.