# THONE A. STENBERG v. COUNTY OF BLUE EARTH and Others.[1]

August 5, 1910.

Nos. 16,710—(230).

**Enjoining erection of dam — damage to riparian owner.**

Chapter 104, Laws 1907, authorized the county commissioners to appropriate an amount not exceeding $300 in any one year for erecting and maintaining sufficient dams or embankments upon or along the shores of Jackson lake, in Blue Earth county, to keep and maintain the water in the lake at its natural and usual height and level. Pursuant thereto, the county commissioners took steps to erect a permanent dam across the natural outlet of the lake. Plaintiff owned land abutting said lake, and sought to enjoin the board from proceeding with the construction of the dam, because thereby her land would be permanently injured and a large part of it destroyed for agricultural purposes. It is *held* that the record justified the finding of the trial court that the effect of the dam would be to restore the natural outlet to its original height, that the board had a right to maintain the water of the

[1]Reported in 127 N. W. 496.

lake at its natural and usual height and level, and that the damage which plaintiff would experience would be merely incidental to an authorized act. In re Lake Minnetonka Improvement, 56 Minn. 513, followed and applied.

Action in the district court for Blue Earth county for an injunction restraining defendants from constructing a permanent dam across the natural outlet of Jackson lake. The complaint, among other matters, alleged that Jackson lake was fed from divers inlets, but principally by means of a runway which drained several hundred acres of low marshy land lying to the south and southwest of the lake; that at the northeasterly side of the lake there was a well-defined natural outlet, which was the only possible outlet; that plaintiff and her children resided upon land adjacent to said lake about one hundred twenty acres of which were low marshy lands and connected with Jackson lake by an inlet, and that they had very little elevation above the waters of Jackson lake, and portions were about the same level as the usual level of the water in the lake; that excepting at times of excessive rains or spring floods she utilized the marshy land for pasture and that it was a source of much profit to her; that defendants threatened to obstruct the outlet of the lake and to raise it above its natural level by building a dam which would raise the waters of the lake at least two feet above its usual level; that if this were done the waters would be forced back over the marshy lands and that her lands and those of the adjacent owners would be permanently flooded and greatly depreciated in value. The answer alleged that the lake was navigable; that for many years the owners of land adjoining it had been interested in having it drained for the purpose of acquiring agricultural lands incident to their ownership as riparian owners; that the residents of the village of Amboy, about a mile distant and having a population of five hundred, and others who were not owning lands adjoining the lake were interested in maintaining the lake in its natural condition and that when in that condition it had been suitable for boating, fishing, hunting, and other sports, and public water supply; that the landowners and certain persons unknown had, at times for more

than a period of twenty years, meddled with the outlet, causing it to become larger, and because of the interference with the outlet it became gradually deepened so that its bottom up to November, 1908, was more than two feet below the natural level of the water, and the lake was greatly damaged for all the uses for which it was suitable; that the board of county commissioners, after a hearing upon a petition asking that the outlet be restored to its natural condition, determined to construct therein a permanent dam to raise the water in the lake to its natural level and to keep it for the beneficial uses incident to its natural condition; that the change of outlet proposed would be of public benefit; that without the construction of the ditch the lake was normally shallow, grassy, of a marshy character and of insufficient depth for fishing, boating, hunting, or public water supply; that a large territory to the south and southwest of plaintiff's land had drained into the lake; that the water so draining into it had no channel, and that by reason thereof the low lands of plaintiff were rendered worthless for agricultural purposes; that the lands of plaintiff would in no way be injured by the construction of the dam.

The case was tried before Quinn, J., who acted for the judge of the Sixth judicial district and made findings of fact, and as conclusion of law ordered judgment in favor of defendants. From an order denying plaintiff's motion for a new trial, she appealed. Affirmed.

*W. R. Geddes* and *F. E. Putnam,* for appellant.

*Walter A. Plymat,* County Attorney, and *S. B. Wilson,* for respondents.

JAGGARD, J.

The plaintiff and appellant sought to enjoin the construction of a permanent dam across the natural outlet of Jackson lake in Blue Earth county. The county commissioners had begun to make the dam pursuant to chapter 104 of the Laws of 1907 (R. L. Supp. 1909, § 434-2), providing that the county board in any one year may appropriate not to exceed $300 for erecting or maintaining sufficient dams or embankments upon or along the shores of the

lake to keep and maintain the water in the lake *at its natural and usual height and level.* (The italics are ours.) The lake in question was shallow, about two and one-fourth miles long and one-fourth mile in width, and surrounded by a large farming country, including the land belonging to plaintiff. The plaintiff insists that, if the dam were constructed, it would raise the water in the lake to a permanent level some eighteen inches to two feet above the natural level, to the injury of her land and the destruction of a large part of it for agricultural purposes. The trial court held that plaintiff was not entitled to the relief asked for. This appeal was taken from its order denying plaintiff's motion for a new trial.

Plaintiff, as a riparian owner, has shown such an interest in the controversy as to entitle her to a judicial determination of the questions raised, but has not shown a right to the relief sought. The law was constitutional. The controversy is primarily determined by the general law of waters. No riparian owner has a right to complain of improvements by the public whereby the water is maintained in the condition which nature has given it. "Aqua currit, et debet currere ut currere solabat." Farnham, Waters, p. 1765. And see volume 1, c. 6. The law justified the maintenance of the lake at its natural and usual height and level. That height, necessarily more or less marked "upon the soil of the bed [of the lake, has] a character distinct from that of the banks in respect to vegetation as well as respects the nature of the soil itself." Damages consequent thereon to riparian owners was damnum absque injuria, for which they were entitled to no compensation. Mitchell, J., in Re Lake Minnetonka Improvement, 56 Minn. 513, 58 N. W. 295, 45 Am. St. 494.

The question then arises whether the facts showed such a case, or one in which low lands, although occasionally overflowed, belonged to the riparian owner, and could not be taken without due compensation. The trial court expressly found that the natural outlet of the lake had been for many years interfered with, sometimes lowered, sometimes raised; that the proposed dam will raise the water in the lake some eighteen inches, or to its usual stage, and that the facts brought the case within the limits assigned to the

Minnetonka Improvement case. These facts were ,vigorously contested. There was much and cogent evidence tending to sustain plaintiff's contention. The matter is one of grave doubt. There was, however, evidence tending to sustain the findings of the trial court. The soil in the bottom of the lake was a fine mulch silt. It was sandy along some of the shores. A surveyor described this shore "as a sandy beach." But parts of the shores of many lakes in this state during dry periods have been used for gardens, pastures, and the like. This fact does not prevent the state from restoring the natural level, any more than the building of piers on the Mississippi at its low stage prevents public authorities from increasing the height of the level of the water by discharging accumulated water from its reservoirs. The rule laid down in the Minnetonka case is not reasonably to be construed as limiting the right of the public to increase the level of the body of water to cases wherein the water mark made by vegetation appears everywhere on the shore line. Indeed, the character of the vegetation itself may constitute a water mark.

We conclude that, within the familiar rule on this subject, the findings of the trial court must be affirmed.