PROVO CITY v. JACOBSEN et al. (STATE, Intervener).

No. 6774.   Decided January 3, 1947.   (176 P. 2d 130.)

See 45 C. J. Navigable Waters, sec. 253; 27 R. C. L. 1317.

For opinion on rehearing, see 111 Utah 68, 181 P. 2d 213.

*I. E. Brockbank* and *George W. Worthen*, both of Provo, for plaintiff-appellant.

*Grover A. Giles*, Atty. Gen., and *Herbert F. Smart*, Asst. Atty. Gen., for intervener-appellant.

*Judd, Ray, Quinney & Nebeker*, of Salt Lake City, *J. Rulon Morgan*, of Provo, and *McCullough & Ashton*, of Salt Lake City, for respondent.

WADE, Justice.

Plaintiff, Provo City, brings this action against the defendants, about forty individuals, to acquire certain lands near the shore of Utah Lake and Provo Bay for a municipal airport. Plaintiff alleges that the state of Utah claims to own said lands which it has leased to plaintiff; that defendants are in possession thereof and claim some right, title and interest thereto and ask that such interest be adjudicated and that such interest, if any, be condemned and plaintiff acquire the same by eminent domain. Utah lake is navigable. The lands in question are bounded on the

west and south by the waters of that lake and Provo Bay and are between the meander line as established in 1856 and the waters of the lake as at present located. The state of Utah intervened, claiming to own such lands on the grounds that on January 4, 1896, when it became a state it acquired title thereby to such lands because at that time they were a part of the bed of the lake. Various defendants answered claiming ownership to various parts of the lands in question and all of the lands in question to a certain line were claimed by one or other of the answering defendants. Defendants claim as successors in interest of persons who received patents, prior to statehood, from the United States to part sections of lands contiguous to and bounded by the lake, the surveyed parts of which lands run from the meander line to the north and east. They claim ownership either by reason of the patents or as riparian owners as the lake receded to the lands formed by reliction or accretion. The defendants are now, and their predecessors in interest have been, in possession of the lands which they respectively claim during all of the time since the patents were issued or since the said lands were uncovered by the waters of the lake. The lands in question slope very gradually toward the water of the lake, and a very slight raise in the elevation of the water causes a large area of land to be thereby covered.

The court found that

"from 1884 to 1895, inclusive, excepting the year 1889, * * * water from Utah lake would periodically cover the property"

involved in this action;

"that on January 4, 1896 the water level of Utah lake * * * was below compromise elevation."

[This elevation was stipulated to be 4488.95 feet above sea level. It was established in 1885 by a commission appointed for that purpose by an agreement between the riparian owners on the shore of Utah Lake and the water

users from the Jordan River at certain monuments designated at various places on the lake shore as the elevation to which the lake waters could be raised.]

"There was no competent evidence offered or received upon which the court can find the high water mark on the lands"

herein involved

"on January 4th, 1896, or at any time prior thereto, except evidence of an old shore line running in a general northerly and southerly direction from the old Provo Resort to Will Peay's cabin. * * *."

The lands here involved are above this old shore line.

The trial court entered judgment in favor of the defendants and against the plaintiff and the state that the defendants are the owners of the parcels of land which they respectively claim. The state contends that the findings and judgment are contrary to law and the preponderance of the evidence. If this is an equity case we must pass on both the law and the facts. So we have examined the evidence to determine where the preponderance is and given due consideration to the opinion of the trial judge who heard the evidence and saw the witnesses.

The state contends that the title to the bed of the lake as it was at the time Utah became a state thereupon became vested in the state; that the high water mark as it was at that time was the boundary line between the property of the state and the riparian owners of the lands bordering on the lake. It further contends that proof of the establishment of the meander line in 1856 was sufficient to make a prima facie case; that the meander line was on the high water mark at that time, and in the absence of a showing of a high water mark at a different place at the time of statehood, the court must presume that it remained at the meander line. The state further contends that no new high water line has been established by the defendants but the state has shown by graphs and charts the levels of the waters of the lake during all the time from the beginning

of 1884 until after Utah became a state. It contends that the average of the highest levels which the water reached each year for all the years during which records were kept prior to statehood is the high water mark. Figured on this basis, the high water mark would be 1.48 feet above compromise elevation.

The state concedes that the meander line is not necessarily the boundary line. *Knudsen* v. *Omansen*, 10 Utah 124, 137 P. 350; *State* v. *Rolio*, 71 Utah 91, 262 P. 987; *Shively* v. *Bowlby*, 152 U. S. 1, 31, 14 S. Ct. 548, 38 L. Ed. 331. There are cases which indicate that in the absence of evidence to the contrary the meander line as established represents the high water mark and is therefore the boundary line. *State* v. *Imlah*, 135 Or. 66, 294 P. 1046. Here there was much evidence both on the part of the state and the defendants as to the levels of the water during the period from 1884 to the time Utah became a state and as to the times when and how much of this land was covered during the various parts of that period, and as to the condition of this ground during that time. In view of this fact, we are not called upon to assume any fact but must determine what the preponderance of the evidence is. Since the state is asserting ownership to this land, it has the burden of proving by a preponderance of all of the evidence where the high water mark was at the time Utah became a state.

The state's evidence showing the highest point the water reached in each year from 1884 to the time Utah became a state does not prove where the high water mark was at that time. The trial court apparently believed that the waters of the lake were at the high levels shown by the graphs because it found that the water periodically covered this land from 1884 to 1895, inclusive, excepting the year of 1889, and we are convinced that such finding is supported by a preponderance of the evidence, but the high water mark is not determined by an average over a period of years of the highest levels which the water reached each year. *Willis* v. *United States*, D. C., 50 F. Supp. 99; *Merill* v. *Board*, 146 Iowa 325, 125 N. W. 222. The

term "high water mark" means what that term indicates— a mark on the land impressed by the water upon the soil by covering it for sufficient length of time so that it is deprived of vegetation and its value for agricultural purposes destroyed. See two cases just cited and Gould, Law of Water, 3rd Ed., Sec. 45; *Raide* v. *Dollar*, 34 Idaho 682, 203 P. 469; *City of Tulsa* v. *Peacock*, 181 Okl. 383, 74 P. 2d 359; *State ex rel.* v. *Sorenson et al.*, 222 Iowa 1248, 271 N. W. 234; *State* v. *Longfellow*, 169 Mo. 109, 69 S. W. 374; *State ex rel. Thompson* v. *Parker*, 132 Ark. 316, 200 S. W. 1014; *Anderson* v. *Reames*, 204 Ark. 216, 161 S. W. 2d 957; *Diana Shooting Club* v. *Husting*, 156 Wis. 261, 145 N. W. 816, Ann. Cas. 1915C, 1148; *Union Sand & Gravel Co.* v. *Northcott*, 102 W. Va. 519, 135 S. E. 589; *Tilden* v. *Smith*, 94 Fla. 502, 113 So. 708; *Carpenter* v. *Board of Commissioners*, 56 Minn. 513, 58 N. W. 295, 45 Am. St. Rep. 494; *Sun Dial Ranch Co.* v. *May Land Co.*, 61 Or. 205, 119 P. 758, 759; *Austin* v. *City of Bellingham*, 69 Wash. 677, 126 P. 59.

The cases cited by the state do not support its contention. For the most part they are cases involving tidal waters where the season to season change in the water level is not great but the change from one tide to another occurs several times daily. In such case, the problem is entirely different from the case where there is a great fluxation from the wet to the dry season of the year.

The cases of *State* v. *Imlah*, 135 Or. 66, 294 P. 1046, 1048, and *Johnson* v. *Knott*, 13 Or. 308, 318, 10 P. 418, quoted from in the state's brief, do not involve tidal waters and each define the high water mark as

"the point to which the water usually rises in an ordinary season of high water."

In *State* v. *Imlah*, the reference is merely incidental. It cites the *Johnson* v. *Knott* case repeating the definition therefrom and no further definition of the term is made. The term

"usually rises in an ordinary season of high water"

without further clarification is very uncertain in its meaning. The case of *Johnson* v. *Knott* [13 Or. 308, 318, 10 P. 420] was a jury case involving only the question of where was the high water mark. In defining that mark, the court used the words above quoted and added:

"This line is easily observed by an examination of the banks of the river long after the water subsides, and an intelligent jury, when permitted to view the locality, will have no difficulty in detecting it,"

which clearly indicates that the court had in mind a mark left on the soil by the water rather than an average of the extreme yearly high levels reached over a period of years.

If the state is correct in its contention that it owns the bed of the lake to the high water mark, we must determine where that mark was at the time of statehood. On this question the court found:

"There was no competent evidence * * * upon which the court can find the high water mark upon the lands * * * on January 4th, 1896, or at any time prior thereto, except evidence of an old shore line running in a general northerly and southerly direction from the old Provo Resort to Will Peay's cabin."

This is a finding that there was no evidence of facts favorable to the state and not a direct finding of the fact of where the high water mark was. In *Robinson* v. *Thomas,* 75 Utah 446, 286 P. 625, 626, we said of a similar finding:

"The plaintiff had the burden of proving such issue. If he failed to do so, a finding with respect thereto ought to have been made against him."

In that case the court treated such finding as a finding of the fact against the plaintiff. Treating this as a finding that the high water mark was at the time of statehood at the old shore line running from the old Provo Resort to Will Peay's cabin, since the evidence discloses that this line was west of the lands in question, if such finding is supported by a preponderance of the evidence, the decision of the trial court must be affirmed.

Such a finding is in accord with the great weight of the evidence. Many witnesses testified that at the time Utah became a state and prior thereto, trees, grass and other vegetation grew thereon, cattle were pastured there and part of it was under cultivation. In addition thereto there was undisputable evidence that about 1887 the old Provo Resort was built near the northwest corner of these lands and a railroad built to this resort; that trees and grass were planted and grew around the resort from the time it was built until after the time of statehood; that Will Peay built his cabin near the southwest corner of these lands in 1892 and lived there during the summer months for several years thereafter; that artesian wells were drilled both at the resort and near the cabin. These facts point unmistakably to the fact that this land was not made useless for agricultural purposes even though the high water did for a short period most years cover the land, and they support by a preponderance of the evidence the finding that these lands were above the high water mark.

The state having failed to prove that these lands were below the high water mark of the lake at the time Utah became a state, it cannot succeed under any theory of the law in regard to such lands and it is unnecessary for us to decide any of the many other questions argued by the various counsel in their briefs. The judgment of the district court is affirmed. Costs against plaintiff.

McDONOUGH and WOLFE, JJ., concur.

LARSON, Chief Justice (dissenting).

I dissent. This case was brought in the District Court, and comes here on appeal, to determine questions of paramount importance, not only to the parties involved in this action, but to the state and all of its citizens generally, and particularly to thousands of its citizens who have pending in embryonic litigation the same questions. These questions have been bobbing up, and recurring for seventy-five years, and each year becomes more difficult of solution because time ruins, kills and eliminates the evidence from which

they must be answered, and yet adds to the value of the stakes involved. The present action which was in course of trial for three years, and in which months and months of time was spent searching and uncovering the available evidence, is now by the main opinion brushed aside and no attempt made to answer one of the most important questions ever to come before this court. Titles and property worth millions and millions of dollars and affecting thousands of people and the state generally depend upon the answers to the questions here presented, and I think this court very remiss in its duty when it does not answer those questions now. The opinion as written will just compel the commencement of another action perhaps by other parties, and the whole thing be done over again. Furthermore that opinion does not even end this case but has the effect of leaving the action pending in the District Court as a condemnation suit to determine the value of property taken for a public use, without determination, and with an impossibility of determining the title to the land.

The questions pleading for, and demanding, an answer are these:

1. Since the state is the owner as trustee for the people of the state of all lands under navigable lakes and streams, what constitutes the boundary line between these lands held in trust on the one side and land of the public domain or privately owned lands on the other?

2. How is the location of such line to be determined?

3. Can a private party obtain interests in such trust lands adverse to the public?

In the present action, these questions arise from the following situation: Provo City, municipal corporation, hereinafter called the city, as plaintiff commenced an action against sixty-four private parties hereinafter called defendants, to obtain undisputed possession of the lands directly involved for a municipal airport. The city alleged a possessory right and interest as lessee of the State of Utah; that defendants claimed and asserted some interest in the lands, occupied the same and refused to quit and yield possession

to the city; and prayed the court for a determination of title, and a decree of condemnation of any lands, or interests therein which might be found to be in defendants. By their answers to the complaint, defendants asserted ownership of the property in themselves by title through patent, by adverse possession, by equitable estoppel, and by judicial estoppel. In addition, one defendant, Erma C. Pope, claimed ownership under the common law doctrine of riparian rights and reliction. The state of Utah intervened asserting its ownership of the property and prayed for decree quieting its title against defendants. The trial sustained plaintiff's demurrer to the affirmative defenses of adverse possession, equitable and judicial estoppel and riparian rights.

The city obtained from the court an Order of Occupancy pendente lite and proceeded with the building of its airport At the trial it was stipulated that the question of title should be first settled, and then the eminent domain proceedings determined. This had the effect, in the first part which is the one now before this court on appeal, of making the action one to quiet title between the state as plaintiff, and the individual claimants as defendants, which action must be resolved upon the answers to the questions posed supra.

When on February 2, 1848, the United States took possession of Utah Territory and the laws of the United States became applicable, the United States took and held all lands under navigable waters, including the shores, up to and including the ordinary high water mark, for the use and benefit of the state that would be subsequently formed with the rights of sovereignty, *State* v. *Rolio,* 71 Utah 91, 262 P. 987; *Packer* v. *Bird,* 137 U. S. 661, 11 S. Ct. 210, 34 L. Ed. 819; *Shively* v. *Bowlby,* 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331; *Broward* v. *Mabry,* 58 Fla. 398, 50 So. 826; *United States* v. *Holt State Bank,* 270 U. S. 49, 46 S. Ct. 197, 70 L. Ed. 465; *Delaplaine* v. *Chicago N. W. R. Co.,* 42 Wis. 214, 24 Am. Rep. 386; *Diedrich* v. *Northwestern Union Ry. Co.,* 42 Wis. 248, 24 Am. Rep. 399.

It is evident therefrom that upon the admission of Utah into the union, the state by virtue of its sovereignty, became

owner of all lands under navigable waters within the State. Utah Lake is a navigable non-tidal lake. Therefore the state is owner as trustee in trust for the people of all lands constituting the bed of the lake, including the shores or spaces if any between the ordinary low water mark and ordinary high water mark. *Pollard* v. *Hagan,* 1845, 3 How. 212, 11 L. Ed. 565.

There is a plain difference, however, between lands coming into the hands of the state by grant from the federal government or by purchase, and the lands under navigable waters title to which are and always was vested in the people as sovereign and controlled by the officials of the state purely as a trust for the protection of the rights of the public, to wit: all the citizens, therein. Lands granted to the state by congress from the public domain passed to the state to be disposed of for the purpose of the grant. Lands acquired by gift, grant, or device and accepted by the state are to be disposed of by law for the purposes for which they were acquired, but lands under navigable waters were never given, granted, or devised to the state or accepted as such by the state. They were always in the people as sovereign, as old as the sovereign itself, a trust created in the state by the people for the express purpose for which such lands were useful when the constitution was set up, to wit: for the protection of the public rights, to use them for commerce without charge, without monopoly; for boating, sailing, fishing, hunting, fowling, pleasure, and other means of recreation, enjoyment, and benefits of all the people. Such lands are not, and under the trust in which they are held cannot become, invested with any private rights, titles, estates, or interests. They are in the nature of a common and no authority has been granted by the sovereign, the people, to the legislature, to waste them, create monopolies in them, or grant exclusive or special privileges therein. Navigable lakes and streams are among the few things still reserved and saved for the benefits of all alike—the one place where men are equal in rights and opportunities; one of the few things saved for all the people from the en-

croachments of a purely commercial attitude and practice, from monopoly and exclusive or special privilege.

Article XX of the state constitution reads as follows:

"(Land grants accepted on terms of trust.)

"All lands of the State that have been, or may hereafter be granted to the State by Congress, and all lands acquired by gift, grant or devise, from any person or corporation, or that may otherwise be acquired, are hereby accepted, and declared to be the public lands of the State; and shall be held in trust for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been or may be granted, donated, devised or otherwise acquired."

It will thus be seen that the constitution itself does not vest the state with any power to sell, lease, or encumber the lands which normally form the beds of navigable lakes and streams. It accepts the lands granted by congress which does not include lands under navigable water (since the federal government never owned such lands and never had any control over them except for the purpose and to the extent of protecting and saving the rights of the people therein from being acquired by private interests), and all lands acquired by grant, gift, or devise, and declares them to be the public lands of the state. It provides that lands are to be *held in trust for the people,* and should be, or can be, disposed of only *for the purposes* for which they were *acquired.* Can it be contended that lands under navigable waters were ever acquired for the purposes of sale, lease, or other special or exclusive privilege? Can it be contended that the right inherent in the people as sovereign to be in the free and equal enjoyment of navigable waters is protected or held inviolate by granting special privileges, leases, or sale thereon? The right of the state to lands below the mean water line is predicated upon the fact that they form the beds under navigable waters, and any attempt to sell or lease them, even though the water has temporarily receded therefrom, is granting special privileges in navigable waters. Such lands are a trust for all the people for such uses and such purposes as may be made by all the people of navigable waters and the lands thereunder, including the right of ingress and egress to and from the water at the shore line in

normal water times. If the state could sell or lease such land, they could extinguish the public rights therein or grant monopoly of all uses to which the waters could be put. It is evident that such lands, while in the state, are a special trust for the people, and no special private rights or privileges can be granted or created therein, nor can any special use be made thereof except such as are public uses, or uses equally available to all.

This gives rise to the deciding issue of this case: What is the boundary line between the lands the United States held as public domain and subject to sale, and the lands constituting the bed of Utah Lake?

The courts and authorities are in accord as to where the boundary mark should lie. It is the line of ordinary high water mark or the level where the body of water would normally stand during high water period, when not affected by floods and draught and free from all other disturbing causes. This general rule was clearly stated in *Seaman* v. *Smith*, 24 Ill. 521, where the court said:

"The line where the water usually stands when unaffected by storms and other disturbing causes is the boundary of the land. Although this body of water has no appreciable tides. [Sic] Here, as in the ocean, the highest point to which storms or extraordinary disturbing causes may drive the water on the shore should not be regarded as the point where the owners' rights terminate, nor yet should it be extended to the lowest point to which it may recede from like disturbing causes. But it should be at the line where the water usually stands when unaffected by any disturbing cause."

The Idaho court adheres to the general rule by describing the boundary as the natural water mark. *Callahan* v. *Price*, 26 Idaho 745, 146 P. 732, 734.

"It is the settled law of this state, that no title to islands, lakes, or the beds of streams passes to the patentees of the United States by the sale of border lots; that the state holds title to the beds of navigable lakes and streams below the NATURAL HIGH-WATER MARK, for the use and benefit of the whole people, subject to the rights vested by the Constitution in the United States." (Caps added.)

The term or word used to describe the high water mark boundary varies among the courts. For example, the court in *Carpenter* v. *Board of Commissioners,* 56 Minn. 513, 58 N. W. 295, 296, 45 Am. St. Rep. 494, used the words "ordinary highwater mark." *Stenberg* v. *Blue Earth County,*

112 Minn. 117; 127 N. W. 496, describes the boundary as "natural and usual height and level." *State ex rel. Beise* v. *District Court,* 83 Minn. 464, 86 N. W. 455, 456, calls it the "ordinary and natural high-water mark." So also does *Gniadck* v. *Northwestern Improvement Co.,* 73 Minn. 87, 75 N. W. 894; *Carlson* v. *St. Louis River, etc.,* 73 Minn. 128, 75 N. W. 1044, 41 L. R. A. 371, 72 Am. St. Rep. 610. *C. Beck Co.* v. *City of Milwaukee,* 139 Wis. 340, 120 N. W. 293, 296, 131 Am. St. Rep. 1061, and *State* v. *District Court of Kandiyohi County,* 119 Minn. 132, 137 N. W. 298, 300, both used the term "ordinary high-water mark."

It is interesting to note that although the courts use these different descriptive words to define the boundary, they all agree that the boundary is as applied above, where the water would normally stand in the high water season if not affected by disturbing causes. The difficulty encountered under this general rule is that inland bodies of water, almost without exception, are subject to disturbing causes. There are numerous decisions written by the courts of nearly every state that have attempted to decide the method for determination of the ordinary high water mark regardless of freshets or droughts and other influences. The leading case is *Carpenter* v. *Board of Commissioners,* 56 Minn. 513, 58 N. W. 295, 297, 45 Am. St. Rep. 494.

" 'High water,' as applied to the sea, or rivers where the tide ebbs and flows, has a definite meaning. It is marked by the periodical flow of the tide, excluding the advance of the water above the line, in the case of the sea, by the winds or storms, and, in the case of the river, by floods and freshets. But, in the case of fresh-water rivers and lakes—in which there is no ebb and flow of the tide, but which are subject to irregular and occasional changes of height, without fixed quantity or time, except that they are periodical, recurring with the wet or dry seasons of the year—high-water mark, as a line between the riparian owner and the public, is to be determined by examining the bed and banks, and ascertaining where the presence and action of the water are so common and usual, and so long-continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as respects the nature of the soil itself."

This general rule has been cited as the law in numerous cases, some of which are:

*Stenberg* v. *Blue Earth County*, 112 Minn. 117, 127 N. W. 496, held:

"That the record justified the finding of the trial court that the effect of the dam would be to restore the natural outlet to its original height * * *. That height, necessarily more or less marked 'on the soil of the bed of the lake, has a character distinct from that of the banks with respect to the vegetation as well as the nature of the soil.' * * * That the board had a right to maintain the water of the lake at its natural and usual height and level, and that the damage which plaintiff would experience would be merely incidental to an authorized act."

*Houghton* v. *Chicago, D. & M. R. Co.*, 47 Iowa 370, held:

"High water mark, as the line between the riparian owner and public, is coordinate with the limit of the river bed and that only is to be regarded as river bed which the river occupies long enough to wrest it from vegetation, so as to destroy its value for agricultural purposes."

*State* v. *Thomas*, 173 Iowa 408, 155 N. W. 859:

"The 'high water mark' of a navigable lake, which, as its name implies, is a water mark, is the outer line of limit of the lake bed, and the 'bed of the lake' is that body of land which the water occupies or covers sufficiently long to denude of ordinary vegetation, and the top of steep banks surrounding the lake cannot be taken as the high-water mark."

In *Carpenter* v. *Board of Commissioners,* supra, the court said:

" 'High-water mark' means what its language imports,—a water mark. It is coordinate with the limit of the bed of the water; and that, only, is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes. Ordinarily, the slope of the bank and the character of its soil are such that the water impresses a distinct character on the soil, as well as on the vegetation. In some places, however, where the banks are low and flat, the water does not impress on the soil any well-defined line of demarcation between the bed and the banks. In such cases, the effect of the water upon vegetation must be the principal test in determining the location of high-water mark, as a line between the riparian owner and the public. It is the point up to which the presence and action of the water is so

continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, constituting what may be termed an ordinary agricultural crop,—for example, hay. *Howard* v. *Ingersoll*, 13 How. 381, [14 L. Ed. 189]; *Stover* v. *Jack*, 60 Pa. 339, [100 Am. Dec. 566]; *Houghton* v. [*Chicago, D. & M.*] *R. Co.*, 47 Iowa 370; *Plumb* v. *McGannon*, 32 U. C. Q. B. 8; Gould, Waters, § 45."

In *Seaman* v. *Smith*, supra, the court describes the ordinary high water mark as that line where the high water usually stands when unaffected by any disturbing cause; on the sea it is the point between the highest and lowest marks produced by the tides; as to lakes it would be that place where the outer edge is usually found.

"The mind would not understand that the highest point on the shore to which it ever attained, nor to the lowest which it receded" would be the ordinary or usual high water mark. In *Faulks* v. *Borough of Allenhurst*, 115 N. J. L. 456, 180 A. 877, high water mark is said to be the medium high tide between spring and neap tides. The Washington court in *Austin* v. *City of Bellingham*, 69 Wash. 677, 126 P. 59, defined high water mark as ordinary high-water mark. The same definition is given in *Flisrand* v. *Madson*, 25 S. D. 457, 152 N. W. 796; *State* v. *Thomas*, 173 Iowa 408, 155 N. W. 859; *Ross* v. *Burkhard*, 90 Cal. App. 201, 265 P. 982; *Bolsa Land Co.* v. *Vaqueras Major Oil*, 25 Cal. App. 2d 75, 76 P. 2d 519. In *Knott* v. *Johnson*, 113 Mass. 238, it is defined as the point to which water usually rises in an ordinary season of high water. In *Erdman* v. *Watab Rapids Power Co.*, 112 Minn. 175, 127 N. W. 487, 128 N. W. 454, it is said to be those points where the water rises to such a height as may reasonably be anticipated. The West Virginia Court in *State* v. *City of Charleston*, 91 W. Va. 318, 112 S. E. 577, said it was the point below which the presence and action of water are so common and usual and so long continued in all ordinary years as to mark upon the soil or vegetation a character distinct from that of the land above. Same definition in *City of Peoria* v. *Central Nat. Bank*, 224 Ill. 43, 79 N. E. 296, 12 L. R. A., N. S., 687, citing Farnham Water & Water Rights, Sec. 67; Gould, Waters, 3rd Ed., Sec. 162. In

*Welch* v. *Browning,* 115 Iowa 690, 87 N. W. 430, we read that it is the line which separates what properly belongs to the lake or river bed from that which belongs to the abutting owners. Soil which is submerged so long and so frequently in seasons of ordinary high water that agricultural crops and non-acquatic vegetation will not grow on it may be regarded as a part of the bed of the body of water which overflows it.

The margin of the bed of a lake or a river which lies between high and low water mark is called the "beach" or "shore" and is a part of the bed. *Sun Dial Ranch* v. *May Land Co.,* 61 Or. 205, 119 P. 758. It is the line on the bank or beach reached by the water when the lake or stream is ordinarily full and the water ordinarily high—the highest limit at the ordinary state of the lake or stream. *Morrison* v. *First Nat. Bank,* 88 Me. 155, 33 A. 782; *Dow* v. *Electric Co.,* 69 N. H. 498, 45 A. 350, 76 Am. St. Rep. 189; *Hamilton* v. *Pittock,* 158 Pa. 457, 27 A. 1079.

A most enlightening case is *United States* v. *Otley,* D. C., 34 F. Supp. 182, dealing with an inland lake which fluctuated greatly in water level. The court repeatedly lays down the rule that the "mean high" is the water level which controls where riparian rights do not modify the rule.

A study of the above cases reveals that where feasible the courts have applied the old common law rule of evidence that was used to decide boundaries involving tide waters and rivers. This rule can be properly applied and can be very helpful when there is a mark upon the soil.

"distinct from that of the bank in respect to vegetation, as well as respects the nature of the soil itself."

But in cases such as this one where we have flat territory supplemented with peculiar conditions and cycles of wet and dry years (as will be shown later), where there is little if any shore, the test ceases to be controlling.

*Merrill et al.* v. *Board of Sup'rs of Cerro Gordo County,* 146 Iowa 325, 125 N. W. 222, held:

"From evidence as to the height of water in a lake in different seasons and in different years, without the water marks on the soil or their elevation, it is impracticable to locate the high-water mark, [when] defined as the line which the water impresses on the soil as the limit of its dominion."

With this particular lake (Utah Lake), as shown by the record, for every foot rise about 1,000 acres of lands are submerged, and on the contrary, for every foot fall this amount of land is restored to use. The elevation is so slight and the outer edges so shallow and effected by swamp and aquatic vegetable growth that the high water mark is extremely difficult if not impossible to ascertain.

It is evident that the application of this old established vegetation rule is of only relative value, in solving this case for, in territory as flat as this is in the vicinity of the lands involved in this action, we have no distinct and deciding mark, therefore we must turn to the best evidence attainable. *Carpenter* v. *Board of Commissioners,* supra. In 45 C. J., under title of "Navigable Waters," at page 535 and 536, Section 206, the author points out:

"The terms refers to the line to which high water ordinarily reaches, and not the line reached by unusual floods. The high water mark, or ordinary water mark, is to be ascertained according to the facts at hand in each case, and, for this purpose, the best evidence obtainable and the best methods available should be utilized."

The line of ordinary high water

"should be ascertained by an examination of the bed and banks * * * and by taking into consideration all the circumstances and all the natural objects conneced therewith." *Pacific Elevator Co.* v. *City of Portland,* 65 Or. 349, 133 P. 72, 79, 46 L. R. A., N. S., 363.

"Where the bank or shore at any particular place is of such a character that it is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore of the same stream or lake to determine whether a given stage of water is above or below ordinary high-water mark." *Diana Shooting Club* v. *Husting,* 156 Wis. 261, 272, 145 N. W. 816, 820, Ann. Cas. 1915C, 1148.

"Marks upon the ground or upon local objects that are more or less permanent may be considered in connection with competent testi-

mony and other evidence in determining the true line of ordinary high-water mark." *Martin* v. *Busch*, 93 Fla. 535, 112 So. 274, 283.

"When the line of ordinary high-water mark is duly ascertained and established by competent authority, such line should be regarded as the true line, unless duly impeached for fraud or mistake." *Martin* v. *Busch*, supra, 112 So. at pages 283, 284.

So to an official meander line made for the purpose of ascertaining, locating and establishing the line between lands under a navigable lake and adjacent swamp and overflowed lands, the lands below being sovereignty lands and the lands above being subject to private ownership by conveyances from the nation or the state, such line is evidence to be considered in determining the true ordinary high water mark. *Martin* v. *Busch*, supra; 45 C. J. p. 536; 1 Kinney on Irrigation and Water Rights, 546. In *City of Cedar Rapids* v. *Marshall*, 199 Iowa 1262, 203 N. W. 932, 933, was involved a situation much similar to that presented in the instant case, as to determining the location of the high water mark. There the court said:

"Were the river and banks in a state of nature at the place in question, the problem would be much easier of solution, but in the last 75 years the changes in the river bank at this place have entirely obliterated all indications on the surface of the natural bed of the stream."

It then reviews the kinds of evidence which it approved and used in determining the line. It mentioned testimony of old settlers as admissible, with the comment that it is not easy to apply such testimony to existing conditions. It notes a series of trenches were dug and examination made of the soil disclosed in the trenches, and noted what it revealed; testimony of geologists; botanists testified as to evidences of different kinds of vegetation, in the soils at different levels; and gave their opinions as to the ordinary high water mark, and the level of these various lines were computed by expert mathematical calculations. Also in evidence were the reading of a government gauge by which the stage of waters had been determined since 1902, and charts were submitted showing the fluctuations of the river

during that period of time. It then upheld a ruling that the line was 121 feet westerly from the west line of First Street, as sustained by the preponderance of the evidence.

Surveys and approved records of yearly lake levels kept by competent recorders, or by authority of law during normal years, or over a series of years so the mean high water level can be ascertained, may be considered in determining where the lake level would normally stand.

In this case the height of the waters in the lake varies from season to season and from year to year, and in cycles of years as much as six feet or more. Such changes could make a difference of a mile or two on the surface of the land as to where the water line would be in this neighborhood. The changes are irregular without fixed quantity or time except that they occur periodically as the years are wet or dry. The periodical changes result in overflowing the low lands near or abutting on the lake at times, and at other periods subside so as to render large areas usually flooded capable of use as meadows and pastures. The conclusions to be deduced from the authorities is that in case such as this the high water mark is mean high water mark; not the average of high water marks which might be thrown far off by one extreme in 10 or 12 years, but the mean which is not affected by unusual or not ordinary changes. As illustrative of the difference the recordings of the highest point attained by the lake during each year from 1884 to 1895 is in the record. We shall refer to the latter in another connection. Suffice it here to say the average of these levels is 1.48 feet above compromise point, while the mean level is 0.90 feet above compromise point.

The prevailing opinion rests entirely upon two points. The first point is that the boundary line of the lands vested in the people as sovereign is the water line on January 4, 1896, when Utah became a state. The second point is that the preponderance of that evidence justified a finding that the high water mark was what in the opinion is called the old shore line running in a general northerly and southerly direction from the old Provo Resort to Will Peay's cabin.

I think the first point wrong as a matter of law and the second point wrong as a matter of fact.

When the United States acquired this territory from Mexico in 1848, it received in a possessory trust for the people of the states thereafter to be created, the lands under navigable water. The title to the lands not under navigable waters vested in the United States as part of the public domain. But title to the lands under navigable waters never vested in the United States. At the close of the revolution when the people became sovereign they as citizens of the various states succeeded to the titles and prerogatives of the crown; and to such rights as had been granted to local governments established by royal sanction. Thus the states acquired all rights previously exercised by the King alone or the King and Parliament, including the bed or soil under navigable waters which is held by the people of the states as sovereign in trust for public uses. *Illinois Cent. R. Co.* v. *State of Illinois*, 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018; Gould on Waters, Sec. 32, and cases cited; *Micelli* v. *Andrus*, 61 Or. 78, 120 P. 737; *Home of Aged Women* v. *Commonwealth*, 202 Mass. 422, 89 N. E. 124, 24 L. R. A., N. S., 79; *Howard* v. *Ingersoll*, 54 U. S. 381, 13 How. 381, 14 L. Ed. 189; *Pollard* v. *Hagan*, 43 U. S. 212, 3 How. 212, 11 L. Ed. 565. In this country the rule applies to inland lakes as well as to tide waters. *Illinois Cent. R. Co.* v. *State of Illinois*, supra. In 1845, the Supreme Court of the United States in *Pollard* v. *Hagan*, supra, declared that the beds and shores of all navigable waters were not granted by the constitution to the United States but were reserved to the states, and that new states have the same rights and jurisdiction over such lands as the original states, and in harmony with the principles announced by Justice McKinley in that case, it has been uniformly held that such lands in new territories acquired by the United States were held in trust by the government, to be transmitted to the new state to be formed, and which states, when formed, possess them with the same rights and powers as the original states.

*Martin* v. *Waddell*, 41 U. S. 367, 16 Pet. 367, 10 L. Ed. 997; *Pollard's Heirs* v. *Kibbe*, 50 U. S. 471, 9 How. 471, 13 L. Ed. 220; *Smith* v. *Maryland*, 59 U. S. 71, 74, 18 How. 71, 74, 15 L. Ed. 269, 270; *Barney* v. *City of Keokuk*, 94 U. S. 324, 24 L. Ed. 224; *Packer* v. *Bird*, 137 U. S. 661, 11 S. Ct. 210, 34 L. Ed. 819. As a necessary result of this ownership in the people of the states, it has been decided that rights in and incident to such lands are to be determined solely with reference to the laws of the state. *Kean* v. *Calumet Canal & Irr. Co.*, 190 U. S. 452, 23 S. Ct. 651, 47 L. Ed. 1134. Most of the states of the arid west have entirely repudiated the doctrine of riparian rights, and of course since the rights to ownership of soil under waters is one of the riparian rights, it has gone with the riparian doctrine.

"In the state of Arizona, Colorado, New Mexico, Nevada, Utah and Wyoming have rejected in toto the doctrine of riparian rights, including the doctrine that abutting land owners can have any claim or interest in or to the beds of navigable lakes or streams greater than or adverse to the public or any other citizen." *Stowell* v. *Johnson*, 7 Utah 215, 26 P. 290; *State* v. *Rolio*, supra; Kinney on Irrigation, 2d Ed., Sec. 331.

Where then is the line between the public domain of the United States and the lake bed, title to which vests in the state when organized? This line of demarcation may be determined in several ways. One of the well established methods was applied by the Federal Government to Utah Lake and is controlling here. In 1856 the Federal Government caused a survey of Utah Lake to be made, and thereby established the meander line of the lake part of which meander line is in evidence in this case as Ex. A. and B. which cover the area about the land concerned in this case. This meander line was run to determine which lands were available for sale by the government, and which lands were not available for sale as constituting the lands which were trusts for the state when created and not subject to sale as government lands. Such meander lines, when run by the Federal Government, or under its authority, are controlling

as to the limits of Federal dominion. Kinney in his work on Irrigation and Water Rights, 2d Ed., Vol. I, Sec. 332, says:

"As far as the rights of the government are concerned, when it meanders any body of water, or a water course and sells the adjoining lands to settlers, and the water is navigable, the title to the bed or soil vests in the state within which it lies, to be used by the state in trust for all the people."

Such lines do not always follow the edges of the high water. Regardless of the causes of any such discrepancies, when the government sells lands down to the meander lines, all title of the government passes the land above the meander line to the settler, and the land between the meander line and the water line to the state in trust for its people. Kinney, supra. Thus passes from the government all control or authority over the lands on both sides of the meander line. *Moore* v. *Robbins,* 96 U. S. 530, 24 L. Ed. 848. The state then has the exclusive right and power to declare the rule of law which is to govern the right or ownership of both the bed of the stream or lake and the land between the meander line and high water line. *Mitchell* v. *Smale,* 140 U. S. 406, 11 S. Ct. 819, 35 L. Ed. 442; *Hardin* v. *Jordan,* 140 U. S. 371, 11 S. Ct. 808, 35 L. Ed. 428, reversing, C. C., 16 F. 823; *Lamprey* v. *State,* 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541.

The title of the private holder abutting the meander will terminate there or extend beyond according to the rule of the state. In states which adopt the riparian doctrine, his title will go to the thread of the stream or center of lake. *Hanson* v. *Rice,* 88 Minn. 273, 92 N. W. 982. Where the rule of the state rejects the riparian doctrine, and the bed of the lake is in the state, the rights of the riparian owners extend to and stop at the mean high water line. *Kean* v. *Calumet Canal,* supra, cases cited above. The effects of the decisions is that the meander line is not necessarily the boundary of the lake, but is the boundary of Government dominion; and the state law or policy as declared by the constitution, or statute or decisions of the courts determines

the true boundary between the private owner and the public. As developed above, the law in this state is, and has always been, that the true boundary line between the lake bed and the private owner is the mean high water line, not on the date of statehood but of the lake in a condition of nature gauged from the time the territory was acquired from Mexico to the time of statehood.

This brings us to the second point of divergence from the prevailing opinion, its holding that the evidence justifies a finding that the mean high water line was a line running "southwesterly from the Old Provo Resort to Will Peay's Cabin," a line which would be below these lands.

With all due respect to the trial court and my associates the evidence is over-whelmingly against such finding. The only evidence in support of such finding is the testimony of 3 or 4 witnesses, testifying from memory of events of over 50 years ago, as to where the water level was at sometime during the years 1887 to 1896. As stated in *City of Cedar Rapids* v. *Marshall,* supra [199 Iowa 1262, 203 N. W. 933],

"It is not easy to apply the testimony of all of these witnesses to the existing conditions."

It should be noted that the trial court found the facts contrary to the testimony of these witnesses, and Mr. Justice WADE approves this finding of the trial court. On the other hand the following facts are admitted: That what is known as compromise point has an elevation of 4488.95 feet above sea level, and was established in 1885 in a controversy between some owner of property abutting Utah Lake including the predecessor in interest of defendants on the one hand and users of water from Jordan River, the outlet of Utah Lake on the other hand and recognized the right of the Salt Lake Canal companies to keep dams in the Jordan until the water reached Compromise point.

This evidence suggests an inference that compromise point was near what the parties considered the mean high water level of the lake, the point below which the Utah county owners had no interest in the land; that since the establish-

ment of compromise point all measurement of water levels have been taken as above or below compromise point; that in 1856 the government ran a meander line around the lake, the map of which as to the area involved is in evidence; that such map shows the surveyed meander line above the lands here involved, and also shows with respect to the meander line, the then water line as drawn by the surveying engineers from observation, and which water line is above all the property involved in this action.

Exhibits C and D are photostats of graphs from the United States geological survey showing the monthly water levels reached by the lake from October 1, 1883 to 1896. It shows the water level as of October 1, 1883, at approximately 1 ft. 10 inches below compromise; about March 1, 1884, it passed compromise and went to approximately 4.8 feet above by July 1; that the lake was continuously above compromise until the middle of August 1887, the annual high points 4.25 feet above in 1885, 3.30 ft. above in 1886; 1.25 ft. above in 1887; at compromise in 1888; 1.40 below in 1889; 0.30 above in 1890; and 0.80 above in 1891; 0.90 ft. above in 1892; 1.80 above in 1893; 0.80 above in 1894; and 0.90 above in 1895, which brings us up to statehood. The mean high water mark of these recorded elevations is 0.90 feet above compromise point.

Exhibit F consists of pp. 183 to 189 U. S. Geological Survey 11 annual report covering a careful survey of Utah Lake made in 1889. It consists of a map of the lake showing the mean high water line and also the line of estimated maximum flood level; and a list of lands by townships, sections, and fractional parts of sections which would be below high flood water, and also shows the lands that would be the bed of the lake up to mean high. Both the map and the lands listed show the lands involved herein to be below the mean high water mark.

As noted by Mr. Justice WADE, the cases hold that in the absence of evidence to the contrary, the meander line as established represents the high water mark. *State* v. *Imlah*, 135 Or. 66, 294 P. 1046. We concede that the mean-

der line of 1856 does not establish the boundary line, that is the ordinary or mean high; but is evidence to be considered. In this connection, the survey line of 1889 shows that it ran the mean high of the lake, and we may, and probably must, assume that at that time there was ample evidence on the soil from which such level could be determined. That line was run on a contour around the entire lake. It should be noted, and the court would take judicial notice of this fact, that for almost a mile at the Old Geneva Resort on the east side of the lake is a high steep clay bank; and at Round Mountain and Lincoln Beach on the south side are rather precipitous rocky shores, which would register water levels better than the swampy areas around the lands in question. Also that the west side of the lake from Pelican Point to near the mouth of the Jordan, a distance of several miles, there is no swampy lands, the shore rising at a good grade, on gravelly, rocky soil where the vegetation is largely sage brush, horse dock and other non-aquatic plants which would clearly show the effect of submergance for any appreciable time year after year. There are other places of shorter distance around the beach where water line would show up more plainly than on the swampy areas. Such evidences were available to the engineers of the Geological Survey who ran the mean high water line in 1889.

Exhibit I, a map of the area surrounding the lands involved in this action, with compromise elevation line and the 1856 meander line shown on the map, shows that all the lands here involved are below the 1856 meander line and nearly all are below compromise point.

In addition to the foregoing undisputed evidence, there is the testimony of some witnesses for plaintiff that they rowed boats over these lands and as high as the old Resort at various times in the years from 1886 to 1891 inclusive. This testimony is subject to the general criticism as to the testimony of defendants' witnesses above referred to due to lapse of time, age, frailties of memory and absence of special reason for noting and remembering the exact or

approximate water levels. The trial court in its findings referred to the facts that there were dams placed in the Jordan River which he thought raised the waters of the lake to an artificial level in the late eighties and early nineties, and Mr. Justice WADE in his opinion notes this fact. The record is silent as to what effect the dam had on lake level. The Geological Survey in its report in evidence as Exhibit "F" says:

"As to the precise influence of the dam in the Jordan, observations are not as yet of a sufficiently detailed character to reveal this clearly. It is obvious, however, that while the dam influences the height of the water in the lake * * * it cannot in the long run obliterate or greatly modify the variations from year to year."

There is no evidence as to the height of these dams, or as to whether during these years they were maintained at a height above the natural bed of the Jordan River. See the case of *Stenberg* v. *Blue Earth County*, 112 Minn. 117, 127 N. W. 496.

The court must also take judicial notice of the fact that during all those years every town, city, ranch and farm in Utah and Wasatch counties were diverting great quantities of waters from the streams feeding Utah Lake, which diversions would tend to substantially lower the lake levels probably to a much greater extent than the Jordan dam could possibly raise the water.

Under the evidence I see no escape from the conclusion that most, if not all, of the lands involved in this action lie below the mean high water mark of Utah Lake in a natural state. The court was therefore in error in its findings against plaintiff. The evidence is not satisfactory as to just where the mean high water line would come with respect to the lands in question but is conclusive that most of the lands are below the mean high water line. The court should therefore have found the level of the mean high water line, and then directed the production of suitable surveys to project that level over the land involved and abutting lands, as the line may run to determine just which

lands belong to the plaintiff and to enter a decree quieting the title of the parties accordingly.

This land is owned by the state in a governmental capacity and therefore cannot be acquired by adverse possession.

"The shores of navigable waters, and the soils under them, were not granted by the constitution to the United States but were reserved to the States respectively; and the new states have the same rights, sovereignty, and jurisdiction over this subject as the original states." *Pollard* v. *Hagan*, supra.

The bed and shore of Utah Lake was acquired by the state at statehood by reason of sovereignty. Prior to the admission of the state into the Union the United States held the bed and shores of the lake, up to the mean high water mark, in trust for the people. The United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future states, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to make particular disposals by some international duty or public exigency. The Supreme Court of the United States so held in *Shively* v. *Bowlby,* 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331.

On January 4, 1896, the State acquired title from the United States to all land below the mean high water mark of Utah Lake and since that time has held this land in trust for the people. The State is acting in a governmental capacity when it holds lands in trust for the people. That there can be no adverse possession against the State when it is acting in a governmental capacity has been so frequently affirmed by the courts that it is necessary to cite only a few decisions touching on this question.

*People* v. *Banning Co.,* 167 Cal. 643, 140 P. 587, 588, held as follows:

"Where tidelands of the state have been dedicated to a public use, there can be no adverse possession thereof sufficient to start the running of limitations against any action by the state or its authorized

agencies to assert the public right or such possession as will give title by prescription to the adverse claimants against the public right."

*Port Townsend* v. *Lewis,* 34 Wash. 413, 75 P. 982, held as follows:

"Ballinger's Ann Code & St. § 5503, giving title by seven years adverse possession and payment of taxes, does not extend to lands held for a public purpose."

*Pioneer Investment & Trust Co.* v. *Board of Education,* 35 Utah 1, 99 P. 150, 152, 136 Ann. St. Rep. 1016, Justice Frick said:

"It may be conceded that, as a general rule, adverse or prescriptive rights cannot be acquired as against the sovereign, and further that the ordinary statutes of limitation, unless they contain some express provision to that effect, are ordinarily held not to apply as against a sovereign state."

*Big Rock Mutual Water Co.* v. *Valyermo Ranch Co.,* 78 Cal. App. 266, 248 P. 264, 267, held:

"Where public lands have been devoted to public use, [they] cannot obtain title thereto by prescription."

*Richert* v. *City of San Diego,* 109 Cal. App. 548, 293 P. 673, 674, also held:

"Land held by state or subdivisions which has been reserved or dedicated to specific public use cannot be taken by adverse possession."

The law is clear, where a state accepts a trust of the nature described, and pledges its faith to an execution of the trust, such land, under the *sacred obligation imposed on its public faith,* by reasonable construction should be excepted from the operation of ordinary statutes of limitation.

The judgment should be reversed, and remanded to the District Court with direction to determine the elevation of mean high water; to cause that elevation to be projected over the lands involved in this action, or abutting lands, and to quiet plaintiff's title to all of the involved lands below such line, and quiet defendant's title to such of the involved lands as are above such line.

PRATT, J., not participating.